UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SCANZ TECHNOLOGIES, INC., fka EQUITYFEED CORPORATION, a Canadian (Quebec) Corporation,<br><br>      Plaintiff,<br>  v.<br><br>JEWMON ENTERPRISES, LLC, et al.,<br><br>      Defendants. | **Case No. 20-cv-22957-RNS/EGT**<br><br>**JURY TRIAL**<br>**DEMANDED** |

**DECLARATION OF BRIAN A. BERG**

I, Brian A. Berg, hereby declare and state as follows:

1.  I have personal knowledge of the following facts, and if called as a witness I could and would competently testify thereto.

## I. INTRODUCTION

2.  I am an independent consultant at Berg Software Design in Ashland, Oregon, and Saratoga, California. I have been retained as an independent Expert Witness in this case (hereafter "Matter") on behalf of the Plaintiff, and I have been asked to render some initial opinions in this Matter. The opinions as set forth below are based on information currently available to me in consideration of my qualifications and my professional judgment.

3.  I am being compensated for my services at an hourly rate of $600. My compensation is not in any way contingent upon the outcome of this case, and I have no financial or personal interest in its outcome.

4.  I reside in Ashland, Oregon, and I am a citizen of the United States of America.

## II. QUALIFICATIONS

5.  I have worked in the industry as a computer engineer since 1974, and also as an independent consultant since 1979. My work has included extensive experience with software, hardware, data storage, memory, buses, peripherals and device interfaces. I have performed teardowns of computerized products in order to analyze their inner hardware and software components, including their networking, data storage and communications functionalities. I have designed, implemented and debugged software including device drivers, embedded firmware, middleware and applications, and I have worked with software and hardware teams in the process of creating consumer products. I have also been a project leader, industry analyst, marketing team

1

member and seminar leader.

6. My consulting work consists of technical engagements as well as serving as a technical Expert Witness, Expert Consultant and Third-Party Auditor in over 80 legal engagements including 23 that involved trade secret disputes. The trade secrets at issue in these engagements have included computer source code, algorithms, networking techniques, computer chip design software, flash memory, and data storage systems. Source code analysis and comparisons have often played an important role in these disputes.

7. I have been a session speaker, conference session chair, program chair, conference chair and conference advisory board member for over 80 industry events which have encompassed technologies including flash memory, networking, server design and data storage. For example, I have been the Technical Chair of the Flash Memory Summit (FMS) international conference in Santa Clara, CA since 2011.

8. My publications include books that I co-edited and/or co-wrote, and articles for journals, periodicals and newsletters. I have also been a book reviewer, and I have been actively involved in professional computer societies and organizations for over 30 years.

9. I am an IEEE Senior Member, and was Chair, Vice Chair and Secretary of the IEEE Santa Clara Valley (SCV) Section (the largest IEEE Section in the world at about 11,000 members) during the years 2010-2012, and I remain active in the SCV Section. I am a Director and past Chair of the IEEE Consultants' Network of Silicon Valley (IEEE-CNSV), and I am Vice Chair of the IEEE Silicon Valley Technical History Committee. I was the recipient of the 2012 Outstanding Leadership and Professional Service Award for the SCV Section, the Central Area of IEEE Region 6, and Region 6 itself (which includes 10 western states). I was also the recipient of the 2017 Outstanding Service and Leadership to the IEEE Award for the SCV Section and Region 6, the

2017 IEEE-USA Regional Professional Leadership Award, and the 2019 SCV Section Chair's Special Award for Outstanding Leadership and Valued Contributions.

10.  I have been the IEEE Milestone Coordinator for Region 6 since 2015 and the History Chair for Region 6 since 2019, and I have been the Champion for these IEEE Milestones: The Floating Gate EEPROM (dedicated in 2012, and including the invention of Data Storage in Flash Memory), SHAKEY: The World's First Mobile Intelligent Robot (dedicated in 2017, and including its impact on Artificial Intelligence and autonomous vehicles), CDMA for Cellular Communications (dedicated in 2017, and including how Code Division Multiple Access spread spectrum technology formed the basis for 2G and 3G cellular mobile standards), the DIALOG Online Search System (dedicated in 2019), the Apollo 11 Lunar Laser Ranging Experiment (LURE) (dedicated in 2019), and the Gravitational-Wave Antenna (dedicated in 2021 at two sites in the US and a third site in Italy).

11.  I received a Bachelor of Science degree in Mathematics in 1974 from Pacific Lutheran University in Tacoma, WA.  Before starting a consulting company with some associates, I completed about 90% of the Electrical Engineering and Computer Science coursework toward a Master of Science in Computer Engineering degree at Stanford University from 1975 to 1978 – this was while I was employed full-time as an engineer at NASA-Ames Research Center in Mountain View, CA (1974-1976) and at Ford Aerospace and Communications Corporation (FACC) in Palo Alto, CA (1976-1979).

12.  In 1978, I co-founded Digital Software Corporation (DSC).  While employed full-time at DSC from 1979 to 1985, my work focused on device driver software for various kinds of hardware including satellite systems.  In 1985, I founded Berg Software Design (BSD), and I have worked as a consultant there since that time.  I have performed consulting services for well over

100 companies.

13. A true and correct copy of my *Curriculum Vitae* is attached as **Appendix A**.

## III. MY OPINIONS

14. I have received and read some of the documents produced in this Matter, including the Complaint of July 17, 2020, Plaintiff's Amended Responses to Defendants' First Set of Interrogatories of February 26, 2021, Plaintiff's Amended and Restated Responses to Defendants' First Set of Interrogatory Responses of March 29, 2021, and other documents identified herein.[1]

15. I was asked to perform an initial review of the most recent identification of Plaintiff's allegedly misappropriated trade secrets, and the documents and files produced to Defendants as part of this identification. I provide a summary of that review here:

   a. *Plaintiff's Amended and Restated Responses to Defendants' First Set of Interrogatory Responses of March 29, 2021*, whose Response to Defendants' Interrogatory No. 1 identifies 532 "trade-secret-protected items and matters" (hereafter "Plaintiff's Trade Secrets"). This document provides a robust disclosure of the "architecture," "parameters," and "architecture underpinning the functionality" of specifically identified entities including components, subcomponents, filtering systems, parameters, elements, sections, action buttons, windows, data columns, menus, submenus and trees that operate within modules and submodules of Plaintiff's product offerings, and which have been alleged to have been misappropriated by Defendants;

   b. A zip file containing folders and files that I understand has been produced to Defendants by Plaintiff, which is about 644MB in size, which unzips a total of 12,237 files that total about 934MB in size, wherein these files appear to include files bearing **Bates Numbers ST00001 through ST11533**, and whose files include Java .jar files, as well as what appears to be both compiled and decompiled object code files, and apparently the entirety of this zip file is related to Plaintiff's Trade

---

[1] Note that the 533 trade secrets identified in the February 26, 2021 complaint were reduced to 532 in the March 29, 2021 complaint when a duplicate was discovered and removed.

4

        Secrets;

    c. A second zip file containing folders and files that I understand has been produced to the Defendants by Plaintiff, which is about 183MB in size, which unzips a total of 29,431 files that total about 367MB in size, wherein these files appear to include files bearing **Bates Numbers ST11534 through ST24648**, and whose files include Java source code (.java files), Java byte code (.class files), Java .jar files, and 3 PowerPoint files which respectively include detailed design and architecture descriptions inclusive of (1) "chunked" data structures which are compressed and optimized (ST11548.pptx), (2) a market data filtering system (ST11553.ppt), and (3) a client-server versioned stream protocol involving data snapshots (ST11557.pptx), and apparently the entirety of this zip file is related to Plaintiff's Trade Secrets.

16. My expert experience involving trade secret litigation includes 13 retentions as an Expert Witness and ten additional retentions as a consulting Expert, with these retentions being for both plaintiffs and defendants, in both civil and criminal cases, and whose venues across the country have included US District Courts, State Superior Courts, and the American Arbitration Association (AAA). The plaintiff engagements amongst these have included investigative work prior to the filing of a case, as well as my participation in the development and presentation of the trade secret descriptions as presented in a number of these cases. Based on this extensive experience with trade secret cases, I can state that *the detailed breadth of this case's trade secret descriptions is far beyond that of any other case for which I have been engaged.* Further, based on my initial assessment, it appears that the combination of these detailed descriptions and Plaintiff's extensive production of technical information and both computer source and object code folders paint *a distinct and detailed picture of the trade secrets alleged to have been stolen.* As such, I would have to respectfully dispute any arguments made to the contrary.

17. By way of comparison, it has been my experience that trade secret cases have typically

included identification of roughly five to 30 trade secrets, and that the language descriptive of these trade secrets has generally been much broader than that used by Plaintiff in this case. Such an approach thus differs markedly from that of the Matter, and of course the reasons for the use of different approaches to the manner in which a case's trade secrets are identified can depend on a variety of factors that are unique to each case. However, Plaintiff in this case chose to use its intimate knowledge of what it refers to as the Scanz Assets to describe its trade secrets in exacting particularity. As a computer engineer, I recognize these trade secret descriptions as being at the level of an intimate look into the architecture of the Scanz Assets. Indeed, Rog. Response No. 1 includes a description of the term "architecture" which, particularly when combined with Plaintiff's robust production which included source code, object code, and descriptions of system architecture and data flow, provides descriptive summaries of hundreds of components that were designed, written, debugged and integrated into a large, complex and powerful software product. Thus, these trade secrets descriptions and identifications are aligned with the extensive efforts necessary in order to create such a product.

18. With regard to Defendants' criticism of Plaintiff's detailed identification of its 533 trade secrets identifications as set forth in Brett D. Jaffe's letter of February 22, 2021 (hereafter "Jaffe Letter"), these criticisms are perhaps based on Mr. Jaffe's experience with the arguably more typical approach of a short set of broad descriptions. It may also be the case that Mr. Jaffe is not familiar with the complexities of designing, writing, debugging and integrating a multitude of components as would be necessary for the software encompassing the Scanz Assets. However, even if either or both of these possibilities are true, I would argue that the level of detail provided by Plaintiff is helpful to all parties so as to avoid the kinds of arguments that often occur in trade secret disputes when more general descriptions are used to define trade secrets.

19. I note that page 1 of the Jaffe Letter cites cases that describe the need for "particularity,"

the identification of "specific characteristics," and the insufficiency of merely describing "by generic category," with regard to trade secret identification.  I also note Mr. Jaffe's assertion on page 2 of his letter that Plaintiff's 533 trade secret descriptions are simply a "vague" list of "features" that "fails to identify any aspect of the 'architecture' that is actually a trade secret," and are "utter nonsense" that include "absolutely nothing about the basis for the case."  These characterizations are unfortunate considering how sizable and descriptive Plaintiff's identifications and productions have been in the Matter.  Indeed, in consideration of (1) my experience in software development, (2) having seen extensive software productions in various trade secret and patent cases (including millions of lines of software code supporting a portion of Amazon's cloud infrastructure), (3) having worked on various trade secret cases as noted above, (4) the apparent alignment of Plaintiff's trade secrets descriptions with what are likely to be identifiable modules within the Scanz Assets, and (5) my opinions as outlined earlier in this section, I find that (a) Plaintiff has more than met the bar regarding the requirements as I have experienced them in similar cases (and as cited from various cases on page 1 of the Jaffe Letter), and (b) I give zero credence to Defendants' criticisms on page 2 of the Jaffe Letter.

      20.     I am still in the very early stages of my engagement in this Matter, and so of course I have no opinions about Defendants' guilt or innocence, and I also have no opinions regarding the efficacy of Plaintiff's or Defendants' technologies.  However, I was alerted to a book entitled *The Complete Penny Stock Course: Learn How To Generate Profits Consistently By Trading Penny Stocks* as authored by Jamil Ben Alluch, with a Foreword by Timothy Sykes, and published by Millionaire Publishing LLC (hereafter "The Book").  After I purchased The Book, I came across two interesting passages: (1) on p. 27, the author states that he has "**a degree in advanced computer security and hacking**" besides "a bachelor's degree in computer engineering" and (2) on p. 91, "StocksToTrade (STT) is the brainchild of millionaire trader Timothy Sykes. **It was originally released as a**

**rebranded version of a different charting software …"** I note that Timothy Sykes, Millionaire Publishing LLC and StocksToTrade.com are amongst the Defendants in the Matter. My experience in trade secrets cases has led me to evidence in which software was stolen from a company, and then "hacked" and used as the starting point for a product offered by another company. I would first need to perform adequate investigative work to reach any conclusion about whether Messrs. Sykes or Ben Alluch, or anyone else, engaged in any such hacking activities in this Matter, and/or whether any "rebranding" efforts intruded upon Plaintiff's ownership of the Scanz Assets. As such, I found these admissions in a published book involving the Defendants, and apparently involving the very products they are accused of stealing, to be at least somewhat troubling.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 6, 2021

_____
BRIAN A. BERG