**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI-DADE DIVISION**

SCANZ TECHNOLOGIES, INC., fka
EQUITYFEED CORPORATION, A Canadian
(Quebec) Corporation,

        Plaintiff,

        v.

JEWMON ENTERPRISES, LLC, *et al.*,

        Defendants.

Case No. 20-cv-22957 (RNS/EGT)

**PLAINTIFF'S NOTICE OF COMPLIANCE**

Plaintiff Scanz Technologies, Inc., fka Equityfeed Corporation, A Canadian (Quebec) Corporation (hereafter "Plaintiff") respectfully submits this Notice of Compliance pursuant to Magistrate Judge Edwin G. Torres' Order Setting Discovery Procedures (hereafter "Magistrate Discovery Order," DE17), identifying the substance of the discovery disputes to be heard on June 4, 2021 at 10:30 a.m. (DE92).

**DISPUTE #1: DEFENDANTS' WHOLESALE REFUSAL TO**
**PRODUCE THOUSANDS OF RESPONSIVE DOCUMENT-FILES**

*Summary And Nature Of Dispute*

The Defendants have engaged in a wholesale refusal to produce thousands of responsive documents after Plaintiff provided Defendants with a good faith extension of time and despite Plaintiff's extensive meet-and-confer efforts. These refusals to produce documents are grounded in numerous associated objections interposed by the Defendants in violation of Sections 1(a), 1(b) and 1(c) of this Court's Magistrate Discovery Order, including, for example, the following document requests and objections by defendants StocksToTrade.com Inc. and

1

Timothy Sykes:

A.	Representative Example No. 1, The StocksToTrade.com
	Source And Object Codes Defendants Refuse To Produce

Defendant StocksToTrade.com, Inc. (hereafter "STT") is refusing to produce any source code or object code algorithms or materials in this case, despite the fact that Plaintiff has not only produced such machine code-information,[1] but has clearly identified such algorithmic materials as among the many trade secrets stolen by the Defendants. Despite Plaintiff's good faith production of all source and object code material it believes were misappropriated by the Defendants comprised of tens of thousands of bates-stamped electronic files, the following colloquy was exchanged involving the interrogatories propounded by Plaintiff on Defendant StocksToTrade.com Inc. seeking the same kind of material (*see* Exhibit 3 of the Source Materials, page 29):

> **Document Request Nos. 154 and 155:**
>
> Any and all documents regarding or relating to the source code [and object code] of any and all products you have offered to the public.
>
> **Responses to Request for Production No. 154 and 155:**
>
> STT objects to this request because it fails to specify documents with reasonable particularity. STT further objects to this request as overly broad and disproportionate to the needs of the case because it seeks information not relevant to any party's existing claim or defense such that the burden of producing responsive documents would outweigh any probative benefit. Source code of STT products [and object code of STT] products has no relevance to Scanz's allegation that STT misappropriated the architecture underlying the functionality contained in the Filter Builder module of Plaintiff's product offerings.

---

[1]  In March 2021, in response to the Defendants' request for production of materials of Plaintiff that were stolen by the Defendants, Plaintiff produced both source and object code data -- as well as source code schematic material -- encompassing tens of thousands of files bearing the following bates stamp numbers: (a) Source Code Material: ST01750 - ST11486 (b) Object Code Material: ST00001 - ST00103; ST01749; ST11559 - ST24648. (c) Schematic Material: ST11487 - ST11502; ST11458 - ST11558.

Counsel for Plaintiff explained in the meet and confer exchanges with defense counsel that the identified trade secrets go well beyond "the Filter Builder module of Plaintiff's product offerings" as incorrectly alleged at the end of Defendant's objection to document request nos. 154 and 155.  Plaintiff suggested that the Defendants carefully read *all* of Plaintiff's 532 trade secrets described in the already litigated response to Interrogatory No. 1 (*see* Source Materials, Exhibit 1).  Plaintiff's counsel further explained the following:

    1.    First, counsel explained that the terms source code and object code were already discussed in prior meet-and-confer sessions relating to the Defendants' document productions, and Plaintiff already produced tens of thousands of electronic files containing the source code, object code and related schematics that were misappropriated by the Defendants.  Given these facts, Plaintiff explained to counsel for Defendants that they cannot reasonably base their refusal to produce source code and object code information on the claim of ambiguity.

    2.    Second, Plaintiff's counsel explained in detail that the Defendants' continued refrain about the nature of Plaintiff's trade secret-identification in response to Interrogatory No. 1 (Source Materials, Exhibit 1) is simply untrue and always has been.  Plaintiff's counsel pointed the Defendants, for example, to trade secret number 79 in Plaintiff's interrogatory responses (*see* Source Materials, Exhibit 1, at page 11), which expressly identifies one of Plaintiff's pivotal trade secrets that specifically involves Plaintiff's computer-based algorithms (i.e., *not* "the Filter Builder module of Plaintiff's product offerings," as the Defendant StocksToTrade.com Inc. alleges in its objection).  Accordingly, Plaintiff's counsel explained throughout the meet and confer process that its trade secret identification is not limited in any way to "the Filter Builder module of

Plaintiff's product offerings" as inaccurately alleged by STT. And Plaintiff further reminded STT's counsel again that Plaintiff produced tens of thousands of source and object code files in specific response to the Defendants' requests for production of the stolen trade secrets. *See also* note 1, *supra,* and accompanying text. This document production supplemented Plaintiff's list of identified trade secrets as a matter of law pursuant to Fed. R. Civ. P. 33(d). *See* Source Materials, Exhibit 1, page 2.

3. Never willing to speak on the foregoing merits, counsel for Defendant StocksToTrade.com Inc. only very generally stated that they "disagree" and that they "believe Plaintiff has only identified publicly-seen trade secrets." When counsel for Plaintiff asked where the architecture of its key algorithms, as discussed in trade secret number 79 (*see* Source Materials, Exhibit 1, at page 11), appears in the public domain, the Defendants' counsel simply refused to answer and restated their general, incorrect, unsupportable position that "everything you have identified is public."

Also during the meet-and-confer process, Plaintiff further explained to Defense counsel (a) that trade secret number 79 is among the most sensitive trade secrets stolen by the Defendants[2] and (b) that the definition of architecture by Plaintiff in trade secret number 79 includes all "designs, frameworks, components, compilations, methods, techniques, elements, ingredients, pieces, dialogues (and other kinds of informational-exchange structures involving data acquisition and interaction) that are necessary or are otherwise utilized under the laws of physics, engineering and mathematics to create or result in the viability, operationalization, serviceability and workability" of the algorithms at issue: there cannot be a serious doubt that

---

[2] Plaintiff's seventy-ninth trade secret was marked "highly confidential computer code," and, despite a challenge by Defendants over this watermark-designation, all of the defendants ultimately withdrew their objection to the "highly confidential" designation after Plaintiff noticed a magistral hearing for May 6, 2021 and docketed its Notice of Compliance as DE83.

this includes computerized machine codes such as source and object code, and no expert would testify otherwise. (*See* Source Materials, Exhibit 1, at page 2.) Equally important, Plaintiff again reminded Defense counsel that the tens of thousands of source and object code electronic files that Plaintiff produced supplemented its response to Interrogatory No. 1 under Fed. R. Civ. P. 30(d) as a matter of law. The Defense counsels' only reaction to the foregoing facts was the repeated general statement that they "totally disagree" and "will not produce any sort of machine code." When pressed about the fact that these "algorithms" referenced in Plaintiff's trade secret number 79 are specifically *not* "the Filter Builder module of Plaintiff's product offerings" as alleged by Defendants, the Defendants did not disagree but instead remained silent and stated that their position "will not change" because "no source or object code will be produced" regardless of Plaintiff's production in March of 2021 of Plaintiff's source and object code materials comprising additional stolen trade secrets.

B.        Representative Example No. 2, Sykes *Alter Ego* And Conspiracy Documents:

Numerous lawyers for Defendant Timothy Sykes' repeatedly stated that they will not produce documents involving Plaintiff's *alter ego* and conspiracy claims set forth in paragraphs 10, 13, 14 and 15 of the Complaint (DE1:4-5). For example, the following documents that are clearly very important to this case are being withheld by Sykes as follows:

> **Document Request No. 76:** Any and all documents regarding or relating to to Your ownership of the website www.stockstotrade.com.
>
> **Response to Document Request No. 76:** Mr. Sykes objects to Request No. 76 as overly broad, unduly burdensome, and disproportionate to the needs of the case because it seeks "all documents regarding or relating to [Mr. Sykes's] ownership of the website www.stockstotrade.com." This case is about the alleged misappropriation of certain trade secrets that were allegedly used to create a stock scanning product offered by Defendant STT. Every document "regarding or relating to [Mr. Sykes's] ownership of the website www.stockstotrade.com" is not relevant to the claims or defenses in this case. The absence of any scope

> or time period limitation further renders this Request overly broad and unduly burdensome. Mr. Sykes will not produce documents in response to this request.

*See* Source Materials, Exhibit 1, page 21 and Exhibit 7, page 38.

During the meet and confer process embracing numerous communications, Plaintiff's counsel attempted to persuade the Defense counsel that this objection is not well taken. Plaintiff's counsel explained that www.stockstotrade.com is one asset at the core of this litigation, and Mr. Sykes' possible ownership of that asset is nearly unrivalled in relevancy and importance, because it represents potentially powerful evidence in support of Plaintiff's claim that all defendants are "dominated and controlled" by Mr. Sykes as their "*alter ego*." *See, e.g.,* DE1:5 (Complaint, ¶ 14). Mr. Sykes' counsel refused to produce this *alter ego* evidence based on their objection to the effect that the only possible issue in the case is "the alleged misappropriation of certain trade secrets that were allegedly used to create a stock scanning product offered by Defendant STT [i.e., StocksToTrade.com Inc.]." *See, e.g.,* Source Materials, Exhibit 7, at p. 38.

C.  Representative Example No. 3, Additional Sykes *Alter Ego* Evidence:

As set forth here and in Table 1 (*see* page 16, *infra)*, there are innumerable *alter ego* and conspiracy inquiries on which Sykes' counsel has refused to produce documents. For example, Source Materials, Exhibit 1 (page 19) and Exhibit 7 (page 21) reflects the following:

> **Document Request No. 46:**
>
> Any and all documents regarding or relating to communications between You and any Defendant regarding the renaming of JewMon to Millionaire Publishing.
>
> **Response to Document Request No. 46:**
>
> Mr. Sykes objects to Request No. 46 on the grounds that it is overbroad and seeks information that is not relevant to the

> claims or defenses in this case because it seeks "all documents regarding or relating to communications between [Mr. Sykes] and any Defendant regarding the renaming of Millionaire Publishing." This case is about the alleged misappropriation of certain trade secrets that were allegedly used to create a stock scanning product offered by Defendant STT. Documents "regarding or relating to communications between" Mr. Sykes and "any Defendant" regarding the renaming of JewMon are not relevant to the claims or defenses in this case or proportional to the needs of the case. Mr. Sykes will not produce documents in response to this request.

In connection with this objection by Defense counsel, Plaintiff's counsel explained to Mr. Sykes' counsel that this case is about more than just trade secret misappropriation and involves extensive *alter ego* claims that include the specific allegation that not only did Defendant Sykes "dominate and control" the affairs of all defendants and defendant-entities (including, for example, Defendants Jewmon and Millionaire Media -- the entities described in Document Request No. 46, above), but also that Sykes achieved the objects of the conspiracy by "utilizing a series of company and product names different from the one he was utilizing during the license agreement, … ." and otherwise used a strategy involving the various interconnected juridic defendants to "hide and camouflage … the defendants' theft and pirating of assets from Scanz." *See, e.g.,* DE1:4,12 (Complaint, ¶¶ 10 and 33). The Defendants' apparent decision to fold defendant Jewmon into the other defendants is vital to understanding Sykes' intentions regarding his interconnected web of companies that Plaintiff claims are all *alter egos* of Sykes and that were allegedly used by Sykes and Westphal in conspiring to camouflage their theft of Plaintiff's stock scanning system.

Nevertheless, counsel for Mr. Sykes responded during the meet and confer session that they do not care about Plaintiff's *alter ego* and conspiracy allegations and view this as a litigation matter where "the only relevant evidence is directly tied to" trade secret

7

misappropriation. Despite the best, good faith attempts of Plaintiff's counsel to resolve this dispute, the only result was that counsel for Mr. Sykes would not budge and confirmed that they will not produce the foregoing *alter ego* and conspiracy evidence.

*Full List Of Items Plaintiff Seeks Production On From Defendants*

With the foregoing as a backdrop, the significant number of meet and confer communications encompassed innumerable additional document requests and other discovery (*see also* Dispute #2, *infra*) on which the Defendants have refused to produce documents or substantively respond to, based upon the same or similar grounds. These additional items are included in Table 1 below, which is set forth on pages 16 through 18, *infra*. All of the Source Materials for these additional disputed discovery items have been submitted in preparation for the June 4, 2021 hearing.

### DISPUTE #2: DEFENDANTS' REFUSAL TO SUBSTANTIVELY RESPOND TO NUMEROUS INTERROGATORIES

The Defendants' lawyers adopted the same approach regarding interrogatories that they employed regarding producing documents: innumerable interrogatories served upon Defendants STT, Sykes and Westphal have not been responded to based on relevance and burdensome objections that are obviously without merit.

A.  Representative Example No. 1, The Sykes Refusals To Answer
    <u>Important Interrogatories On Bases That Are Without Merit</u>

A classic example of the dispute about interrogatories is found in counsel for Mr. Sykes claiming certain interrogatories are burdensome based on the same "only misappropriation evidence is relevant" objection that Sykes' counsel interposed for the documents. The first example also finds Sykes' counsel interposing the unfortunately baseless objection that the interrogatory is improper because the requested information can more easily be obtained by other means. The problem is that those other means are document productions Mr. Sykes has

*also* refused to comply with. The net result is that Plaintiff has no means to obtain the requested discovery because Mr. Sykes' counsel is refusing to respond to *both* interrogatories *and* document requests about the topic. One instance of this condition involves the following interrogatory and objection colloquy exchanged by Plaintiff Scanz Technologies and Defendant Sykes (*see* Source Materials, Exhibits 5 and 9, pages 13-14 and 4-5, respectively):

**Interrogatory No. 5:**

For all periods from January 1, 2013 through and including the date upon which the Complaint in this Matter was filed, identify any and all transfers, payments, remittances, movements or deliveries of property (hereinafter "transfers") involving You, on the one hand, and any of the Defendants, on the other hand, including, without limitation, such transfers by you to any of the Defendants or any of the Defendants to you. For each transfer, please also describe the dates, amounts and all surrounding circumstances and explanations about and involving each such transfer.

**Response to Interrogatory No. 5:**

Mr. Sykes objects to Interrogatory No. 5 as unduly burdensome because it would require Mr. Sykes to search through all of his financial records for a period of over eight years. This information can be obtained more easily through other sources. Mr. Sykes further objects to this Interrogatory because it seeks information that is not relevant to the claims or defenses in this case. This case is about the alleged misappropriation of certain trade secrets that were allegedly used to create a stock scanning product offered by Defendant STT. "[A]ll transfers, payments, remittances, movements or deliveries of property involving" Mr. Sykes and any of the Defendants have nothing to do with the alleged misappropriated trade secrets at issue in this case.

The meet and confer sessions on this issue started with Sykes' lawyers refusing to discuss the fact that the subject matter of this interrogatory is directly relevant to Plaintiff's conspiracy and *alter ego* claims, except to say that they are not interested in talking about such allegations in the Complaint. And when Plaintiff's counsel reminded opposing counsel that opposing counsel's "available through other means" objection is frivolous for the reason that

Mr. Sykes has refused to produce documents regarding the same topic covered by this interrogatory, counsel for Mr. Sykes merely stated that they "disagreed" and are "unwilling to change" their position.

The document production requests and responses demonstrating that Plaintiff has indeed been totally blocked by Sykes' counsel on this issue -- blocked from receiving *any* of the requested information (whether documents *or* interrogatory responses) despite its importance to Plaintiff's *alter ego* and conspiracy claims -- are document request nos. 60, 61, 62, 63, 64, 65, 66, 67, and 129, and Mr. Sykes responses thereto. *See* Source Materials, Exhibit 1 (pages 20-21 and 27) and Exhibit 7 (pages 39-35 and 57-58), respectively.

B.     Representative Example No. 2, The Westphal Refusals To Answer
       <u>Important Interrogatories On Bases That Are Obviously Meritless</u>

The responses to interrogatories by Defendant Zachary Westphal are equally without merit. Indeed, not only did Westphal interpose the same relevancy-based objections but Westphal also refused to answer critical interrogatories for no apparent reason. Emblematic examples are found in the colloquy surrounding two very simple interrogatories concerning Plaintiff's *alter ego* and trade secret allegations:

> (i)
>
> **Interrogatory No. 5:**
>
> Identify any and all transfers, payments, remittances, movements or deliveries of property (hereafter "transfers") involving You, on the one hand, and any of the Defendants, on the other hand, including, without limitation, such transfers by you to any of the Defendants or by any of the Defendants to you. For each such transfer, please also describe the dates, amounts and all surrounding circumstances and explanations about and involving each such transfer.
>
> **Response to Interrogatory No. 5**

> Mr. Westphal objects to this request as overly broad to the extent it seeks information regarding transfers unrelated to Scanz's allegation of trade secret misappropriation that are not relevant to any parties claim or defense including monetary transactions conducted in the normal course of business between Mr. Westphal and companies of which he is an owner, part-owner, or employee. Mr. Westphal further objects to this request because it is not reasonably limited in scope or time as it seeks information regarding "any and all" transfers.

See Source Materials, Exhibits 6 and 11, pages 14 and 5, respectively.

During the meet and confer exchanges, Plaintiff explained once again that its *alter ego* and conspiracy allegations are clear and unambiguous to the effect that all of the juridic defendants -- which appear to utilize substantially identical office locations and which share common ownership -- are simply one and the same enterprise that cannot be distinguished under the law. The intercorporate transfers among these entities is critical to Plaintiff's *alter ego* and conspiracy claims and Plaintiff explained that to counsel for Westphal. The only answer Plaintiff received was that counsel for Westphal "doesn't care" about Plaintiff's *alter ego* and conspiracy claims and will not produce any information of any kind responsive to interrogatory no. 5.

(ii)

Westphal also simply refused to answer interrogatories regarding his understanding of key trade-secret-related provisions of the License Agreement at the time the Defendants entered into the License Agreement. This License Agreement was actually lodged with the Court by his co-defendant Timothy Sykes as DE41-1. The License Agreement is referred to throughout the Complaint not only as the purported basis for the parties' initial involvement together but also as one basis for Plaintiff's attempt to protect its trade secrets from what Plaintiff alleges is the Defendant's theft and misappropriation of those trade secrets. Indeed, Plaintiff seeks, in its

11

prayer, that the Court specifically enforce the confidentiality and non-disclosure provisions of that License Agreement protecting its trade secrets. *See* DE1:8-10, 12, 13, 14-16, 19 and 35 (Complaint, ¶¶ 26-30, 33, 35-37, 40-43, 54 and 109m).

Despite having disclosed to Westphal's lawyers the foregoing during the meet and confer sessions, Westphal's lawyers simply refused to permit Westphal to answer the question of what Westphal thought was meant by the key provisions of the License Agreement at the time it was entered into. In refusing to disclose whether he ever had an understanding of the meaning of key provisions, Westphal instead objected and said the document speaks for itself. Importantly, at its core, this interrogatory merely calls for a yes or no answer regarding whether Westphal had an understanding of a key provision at the time his partner Timothy Sykes signed the License Agreement. But even that core question will not be answered by Westphal. The colloquy, and interrogatory, on the matter follows (*see* Source Materials, Exhibits 6 and 11, and pages 17 and 11-12, respectively):

> **Interrogatory No. 12:**
>
> With respect to the provision of the License Agreement embodied in the second sentence of Section 15 of the License Agreement (which sentence reads, "After termination of this Agreement, while it is acknowledged that JewMon may create and procure a competitive market analysis platform to offer to its customers, JewMon shall not utilize any portion of the Software and shall not copy the 'look and feel' of the Software/Website.") please describe your belief, impression, interpretation, or understanding by You regarding the meaning of this particular provision of the License Agreement at all times prior to the time Timothy Sykes signed the License Agreement and at the time Timothy Sykes signed the License Agreement.
>
> **Response to Interrogatory No. 12:**
>
> Mr. Westphal objects to this request as unintelligible because it seeks information regarding his "belief, impression, interpretation, or understanding" of the meaning of a provision

>of an agreement to which he was not a party. Mr. Westphal further objects to this request as overly broad because it seeks information unrelated to Scanz's allegation of trade secret misappropriation. Mr. Westphal further objects to this request to the extent it seeks information regarding confidential communications between Mr. Westphal and his attorneys protected by the attorney-client privilege and the work product doctrine. Mr. Westphal states that he understands the quoted provision to be part of an agreement between EquityFeed and JewMon the terms of which speak for themselves.

Counsel for Westphal refused to change their position, refused to even provide an answer to the question of whether Westphal ever had an understanding regarding what this paragraph meant (just a yes or no answer), *and even refused in the next interrogatory to disclose whether Westphal ever talked to his technology development team regarding his understanding of this key provision that appears to preclude the Defendants from even attempting to purloin Plaintiff's technology as they in fact did. See Id.,* pages 17-18 and 12-13, respectively.

>(iii)

Plaintiff believes that Defendant Westphal may have worked directly with lawyers in stealing Plaintiff's product, and it propounded an important interrogatory that merely asks for the first date in time when counsel was contacted by the Defendants regarding the Defendants' competing technology platform. Unfortunately, Westphal refused to even answer that question regarding merely his identification of a chronological date. The meet and confer session involved Westphal's counsel stating that they are "not interested" in providing the date. Here is the interrogatory colloquy:

>**Interrogatory No. 20:**
>
>From a chronological perspective, please identify the earliest historical date on the Gregorian Calendar when any of the Defendants first communicated with an attorney, law firm or lawyer concerning or relating in any manner to a business, architecture, software application or other technology involving a Scanning Platform other than the white label product identified in the License Agreement.

> **Response to Interrogatory No. 20:**
>
> Mr. Westphal objects to this request as overly broad because it seeks information unrelated to Scanz's allegation of trade secret misappropriation. Mr. Westphal further objects to this request because it seeks information regarding confidential communications between Mr. Westphal and his attorneys protected by the attorney-client privilege and the work product doctrine.

When Plaintiff's counsel indicated during the meet and confer that merely providing a date could not violate the attorney client or work product privileges, counsel for Westphal merely said they "disagreed." And Westphal's counsel further refused to even acknowledge that any involvement, by counsel, with Defendants' trade secret theft in 2013, 2014 or 2015 (for example) would be extremely important information because it would obviously demonstrate that the Defendants may have believed they were doing something wrong at the time and would insinuate possibly additional participants in the alleged conspiracy. Instead, his counsel merely remarked that they "disagree" and "will not change their position."[3]

C.  Representative Example No. 3, The StocksToTrade.com Inc. Refusals To Answer Important Interrogatories On Bases That Are Obviously Meritless

The positions espoused by counsel for StocksToTrade.com Inc. were no different than the other Defendants. The following is a key example of what Plaintiff sincerely believes is very much akin to bad faith stonewalling in discovery by StocksToTrade.com Inc.:

> **Interrogatory No. 4:**
>
> Identify any and all transfers, payments, remittances, movements or deliveries of property (hereafter "transfers") involving You, on the one hand, and any of the Defendants, on the other hand, including, without limitation, such transfers by You to any of the

---

[3] Defendants Sykes and StocksToTrade.com Inc. also refused to answer the identical interrogatory (*see, e.g.,* Source Materials, Exhibit 9, page 16 and Exhibit 10, page 13, pertaining to Interrogatory Nos. 25 and 14, respectively, served upon Sykes and STT) and Plaintiff -- as a part of Dispute #2 -- respectfully requests that Sykes and STT be ordered to respond to this Interrogatory just as Westphal should be ordered to respond.

> Defendants or by any of the Defendants to You. For each such transfer, please also describe the dates, amounts and all surrounding circumstances and explanations about and involving each such transfer.
>
> **Response to Interrogatory No. 4:**
>
> STT objects to this request as overly broad to the extent it seeks information regarding transfers unrelated to Scanz's allegation of trade secret misappropriation that are not relevant to any parties claim or defense including monetary transactions conducted in the normal course of business between STT and companies or individuals of which one or more of such individuals is an owner, part-owner, or employee of one or more of such companies. STT further objects to this request because it is not reasonably limited in scope or time as it seeks information regarding "any and all" transfers.

*See* Source Materials, Exhibits 5 and 10, and pages 13 and 4-5, respectively.

During the meet and confer and communication process, Plaintiff's counsel reminded STT's counsel of the *alter ego* and conspiracy allegations in the Complaint and of the fact that transfers by defendant StocksToTrade.com Inc. to any of the Defendants is highly relevant not only to the *alter ego* but also to Plaintiff's damages claim. Plaintiff's counsel also pointed out that if it wins its case against StocksToTrade.com Inc. and proves that the product was purloined from Plaintiff then any monies flowing through StocksToTrade.com Inc. are highly relevant to both allegations. The Defendants' position was clear that they are refusing to produce any information regarding money flowing among the Defendants and StocksToTrade.com Inc, partially because counsel says they "don't care" about Plaintiff's *alter ego* allegations and partially based on their relevancy objection that "only trade secret misappropriation evidence is relevant" as set forth in their objection.

### COMPLETION Of DISPUTES: ADDITIONAL BLOCKED DOCUMENTS AND INTERROGATORIES

The following table sets forth the additional items Plaintiff respectfully seeks relief on,

all of which involve substantially similar bases upon which the Defendants have objected. Each Source Material Exhibit relating to these items has been submitted in preparation for the hearing on this matter:

### TABLE OF ADDITIONAL IMPROPER OBJECTIONS

| Interrogatory/Request For Production | Defendants' Objections | Plaintiff's Rebuttal During Meet And Confer Process |
|---|---|---|
| **Sykes Document Request No. 38:** *Sykes' current and former ownership interests in any corporate Defendant.* | 1. Overly broad, unduly burdensome, and disproportionate to the needs of the case. 2. Not relevant because the only issue in the case is trade secret misappropriation. 3. Overly broad and unduly burdensome due to no scope or time period limitation. 4. "There are far more efficient methods of discovery than this document request to determine Mr. Sykes's ownership interest in any Defendant." | This request is highly relevant to *alter ego* as it will determine the level of control Sykes had over each Defendant over the years. |
| **Sykes Document Request No. 44:** *The decision to rename JewMon to Millionaire Publishing.* | 1. Overly broad. 2. Not relevant because the only issue in the case is trade secret misappropriation. | This request is relevant to both the trade secrets claim and *alter ego*. Because JewMon was involved in developing the STT platform while the License Agreement was in effect, it is important to understand why it changed its name to Millionaire Publishing since the name change may have been a move by Defendants to conceal their misappropriation of Scanz' trade secrets. |
| **Sykes Document Request No. 64:** *Monetary transactions between STT and any Defendant.* | 1. Overly broad, unduly burdensome, and disproportionate to the needs of the case. 2. Not relevant because the only issue in the case is trade secret misappropriation. 3. Overly broad and unduly burdensome due to no scope or time period limitation. | This request is very relevant to *alter ego* as it asks for all monetary transactions and exchanges between Sykes and each Defendant. The flow of monies between Defendants is essential to determine the relationship and status between the Defendants. As for Sykes, it is also important to determine the amount of control he exerted over the Defendant entities. |
| **Sykes Request No. 67:** *Agreements or transactions involving Sykes and any Defendant.* | 1. Overly broad, unduly burdensome, and disproportionate to the needs of the case. | This request is highly relevant to *alter ego* as seeing how few or many agreements or transactions Sykes has entered into with the other Defendants is probative to Sykes' |

| | | |
|---|---|---|
| | 2. Not relevant because the only issue in the case is trade secret misappropriation.<br>3. Overly broad and unduly burdensome due to no scope or time period limitation. | relationship with Defendants. Further, it will show the level of control Sykes has had over the Defendant entities. It will also show the extent of Westphal's role in the Defendants insofar as he was involved in Sykes' agreements or transactions with Defendants. |
| **STT Request for Production No. 34:**<br>*STT's current and former ownership interests in any corporate Defendant.* | 1. Failure to specify documents sought with Reasonable particularity.<br>2. Overly broad and disproportionate to the needs of the case because the information sought is not relevant. | This is relevant to *alter ego* to show STT's position among the Defendants. Further, STT's objections are pure boilerplate in violate of the Magistrate's Standing Order. |
| **STT Request for Production No. 35:**<br>*STT's current and former ownership interests in any corporation or juridic entity.* | 1. Failure to specify documents sought with Reasonable particularity.<br>2. Overly broad and disproportionate to the needs of the case because the information sought is not relevant. | This is relevant to *alter ego* in tandem with STT RFP No. 34. This will help determine whether STT has any ownership presence outside of the Defendants. |
| **STT Request for Production No. 52:**<br>*All physical locations that STT has ever owned, possessed, or used.* | 1. Failure to specify documents sought with Reasonable particularity.<br>2. Overly broad and disproportionate to the needs of the case because the information sought is not relevant. | This request is highly relevant to *alter ego* as it will determine whether STT operates out of the same physical locations as Defendants. The information sought is with more than reasonable particularity, as it expressly includes STT to include documents about the headquarters, principal place of business, offices, properties, storage facilities, real estate they have owned or possessed in any manner. |
| **STT Request for Production No. 56:**<br>*Financial obligations that STT has shared with any Defendant.* | 1. Failure to specify documents sought with Reasonable particularity.<br>2. Overly broad and disproportionate to the needs of the case because the information sought is not relevant. | This request is relevant to *alter ego*. It is important to see whether Defendants maintained largely separate financial affairs or regularly covered each other's financial obligations and liabilities. It is also relevant to the trade secret claim to the extent of understanding who was financially involved in the development of the STT platform, such as paying invoices from Scopic Software. |
| **STT Request for Production No. 65:**<br>*Monetary transactions between STT and any Defendant.* | 1. Failure to specify documents sought with Reasonable particularity.<br>2. Overly broad and disproportionate to the needs of the case because the information sought is not relevant. | This request is very relevant to *alter ego* as it asks for all monetary transactions and exchanges between STT and each Defendant. The flow of monies between Defendants is essential to determine the relationship and status between the Defendants. |

| | | | |
|---|---|---|---|
| | | | Further, STT's objection is complete boilerplate. |
| **STT Request for Production No. 68:**<br>*Agreements or transactions involving STT and any Defendant.* | 1. Failure to specify documents sought with Reasonable particularity.<br>2. Overly broad and disproportionate to the needs of the case because the information sought is not relevant. | | This request is relevant for the same reasons as Sykes RFP No. 67. STT's transactions with Defendants or lack thereof are relevant to *alter ego*. Further, the objections raised by STT are wholly boilerplate. |
| **STT Request for Production No. 109:**<br>*Amount of time spent on development of the STT scanning platform* | 1. Failure to specify documents sought with Reasonable particularity.<br>2. Overly broad and disproportionate to the needs of the case because the information sought is not relevant.<br>3. "Subject to and without waiving its objections, STT will produce [] document . . . showing the amount of time spent on development of the features of the STT platform that Scanz alleges provide the same functionality . . . as the alleged misappropriated trade secrets in this case." | | This request is highly relevant to the trade secret claim. This is important to determine how quickly the STT platform was developed. This can be compared with the development time of other platforms. Several courts have found a defendant's speedy emergence into an industry to be probative in a trade secret misappropriation claim. |
| **STT Request for Production No. 113:**<br>*Development of software language and associated computer logic regarding the development of the STT scanning platform, including but not limited to coding and programming.* | 1. Failure to specify documents sought with Reasonable particularity.<br>2. Overly broad and disproportionate to the needs of the case because the information sought is not relevant.<br>3. Coding and programming of the STT platform is not relevant.<br>4. "Subject to and without waiving its objections, STT will produce [] documents . . . mentioning software language and computer logic corresponding to the features of the STT platform that Scanz alleges provide the same . . . as the alleged misappropriated trade secrets in this case." | | This request is very relevant to the trade secret claim. Claiming that coding and programming are not relevant to the architecture of the STT and Scanz platforms, including Filter Builder and Screener+, is frivolous. Coding and programming are necessary to make such architectures functional. This is followed by a "subject to and without waiving its objections" statement that is expressly forbidden by the Standing Order. |
| **STT Request for Production No. 122:**<br>*Development, design, and testing of the user interface of the STT scanning platform.* | 1. Failure to specify documents sought with Reasonable particularity.<br>2. The User Interface of the STT platform is "is not relevant to the features of the STT platform that Scanz alleges provide the same functionality . . . as the alleged misappropriated trade secrets in this case." | | STT's claim that the user interface of the STT platform is irrelevant to the trade secret claim is frivolous. The user interface is an integral element of software applications. The user interface is a key element of the architecture of the 532 parts of the Scanz platform that Plaintiff alleges was misappropriated. |
| **Sykes Interrogatory No. 23:**<br>*From 2015 to March 2021, Sykes' revenues, inter alia,* | 1. Not relevant because the only issue in the case is trade secret misappropriation. | | This interrogatory is relevant to damages for the trade secret claim as well as the *alter ego* allegations. |

| | | |
|---|---|---|
| *connected to business related to www.stockstotrade.com, including the STT platform.* | | Subparts b and c were not substantively responded to at all by Sykes. And it cannot reasonably be doubted that if Sykes *directly* received revenues from the STT platform that such evidence would tend to establish his control thereof. |

## LOCAL RULE 7.1(A)(3) CERTIFICATION

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movants have conferred with all parties who may be impacted by the relief sought in this application in a good faith effort to resolve these issues, but have been unable to do so.

Dated: June 1, 2021                              Respectfully Submitted,

By:     /s/Gustavo D. Lage_____
Gustavo D. Lage, Esq.
Florida Bar No. 972551
SQUIRE LAW GROUP, P.A.
301 W. Atlantic Avenue, Suite 5
Delray Beach, FL 33444
Phone: 888.788.8816
Fax: 786.577.0425
dlage@squirelawgroup.com
ebotwin@squirelawgroup.com

*Attorneys for Plaintiff*
SCANZ TECHNOLOGIES INC.

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Electronic Service List for this Case.

June 1, 2021                              By:   /s/ Gustavo D. Lage_____
Gustavo D. Lage, Esq.