**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

SCANZ TECHNOLOGIES, INC.,

          Plaintiff,

vs.

JEWMON ENTERPRISES, LLC, et al.,

          Defendants.

**Case No. 20-cv-22957-SCOLA/TORRES**

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS TRADE
SECRETS CAUSES OF ACTION, AND FOR A LIMITED EVIDENTIARY
HEARING ON PLAINTIFF'S CLAIM OF FRAUDULENT CONCEALMENT**

## Table of Contents

Table of Authorities ............................................................................................................ ii

Preliminary Statement ......................................................................................................... 1

Relevant Background ........................................................................................................... 1

MEMORANDUM OF LAW ................................................................................................ 2

Legal Standards .................................................................................................................... 2

I.    Introduction: The Issues Presented Can Be Properly Resolved at Summary Judgment ...... 4

II.   The Evidence Establishes the Existence of Trade Secrets Which Defendants Acquired By Improper Means ........................................................................................... 6

    A.    There Can Be No Genuine Dispute that Trade Secrets Are At Issue Which Possess Independent Economic Value ............................................................. 6

    B.    The Defendants Acquired Scanz' Trade Secrets by Improper Means ....................... 11

    C.    Scanz Took Reasonable Steps to Protect Its Trade Secrets ........................................ 12

III.  The Evidence of Copying and Use of Scanz' Trade Secrets by the Defendants Is Undisputed and Overwhelming ............................................................................... 13

IV.   The Failure to Impose Alter Ego Liability Would Produce an Inequitable Result ........ 17

CONCLUSION ..................................................................................................................... 20

Certificate of Service ........................................................................................................... 21

# Table of Authorities

## Cases

*Allen v. Tyson Foods Inc.*,
   121 F.3d 642 (11th Cir. 1997) ............................................................................ 3

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).................................................................................... 2, 20

*Biodynamic Techs., Inc. v. Chattanooga Corp.*,
   644 F. Supp. 607 (S.D. Fla. 1986) ................................................................... 8

*Calpetco v. Marshall Exploration, Inc.*,
   989 F.2d 1408 (5th Cir.1993) ........................................................................... 5

*Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*,
   No. 3:13 CV-82-CRS, 2018 WL 4688737 (W.D. Ky. Sept. 28, 2018) ................... 10

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).......................................................................................... 2

*Century Sr. Servs. v. Consumer Health Ben. Ass'n, Inc.*,
   770 F. Supp. 2d 1261 (S.D. Fla. 2011) ............................................................ 18

*Compulife Software Inc. v. Newman*,
   959 F.3d 1288 (11th Cir. 2020) ................................................................ passim

*Concord Fabrics, Inc. v. Marcus Bros. Textile Corp.*,
   409 F.2d 1315 (2d Cir. 1969)......................................................................... 15

*Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*,
   136 F. Supp. 2d 1271 (S.D. Fla. 2001) .............................................................. 3

*E. I. duPont deNemours & Co. v. Christopher*,
   431 F.2d 1012 (5th Cir. 1970) ....................................................................... 12

*Eckhardt v. United States*,
   463 F. App'x 852 (11th Cir. 2012)................................................................... 17

*Gasparini v. Pordomingo*,
   972 So.2d 1053 (Fla.Dist.Ct.App.2008) ......................................................... 17

*Geodetic Servs., Inc. v. Zhenghzou Sunward Tech. Co.*,
  No. 8:13-CV-1595-T-35TBM, 2014 WL 12620804 (M.D. Fla. Apr. 4, 2014) ...................... 12

*Imperial Chemical Industries, Ltd. v. National Distillers & Chemical Corp.*,
  342 F.2d 737 (2d Cir.1965) ................................................................................. 11

*In Mapei Corp. v. J.M. Field Mktg., Inc*,
  295 So. 3d 1193 (Fla. Dist. Ct. App. 2020) .............................................................. 13

*In re B.L. Jennings, Inc.*,
  373 B.R. 742 (Bankr. M.D. Fla. 2007) ..................................................................... 20

*Jadael Inc. v. Elliott*,
  No. 6:05-CV-1623-ORLDAB, 2007 WL 2480387 (M.D. Fla. Aug. 29, 2007) .................. 7, 10

*KW Plastics v. U.S. Can Co.*,
  No. CIV. A. 99-D-286-N, 2001 WL 237306 (M.D. Ala. Jan. 20, 2001).................................. 4

*Lee v. Cercoa, Inc.*,
  433 So. 2d 1 (Fla. Dist. Ct. App. 1983) ................................................................... 10

*Lipsig v. Ramlawi*,
  760 So.2d 170 (Fla.Dist.Ct.App.2000) .................................................................... 17

*Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*,
  922 F.3d 946 (9th Cir.) ....................................................................................... 15

*Matrix Health Grp. v. Sowersby*,
  No. 18-61310-CIV, 2019 WL 4929917 (S.D. Fla. Oct. 7, 2019) .......................................... 3, 4

*MCI Telecommunications Corp. v. O'Brien Mktg., Inc.*,
  913 F. Supp. 1536 (S.D. Fla. 1995) ........................................................................ 19

*Miller v. Harco Nat'l Ins. Co.*,
  241 F.3d 1331 (11th Cir.2001) .............................................................................. 17

*Najran Co. for Gen. Contracting & Trading v. Fleetwood Enterprises, Inc.*,
  659 F. Supp. 1081 (S.D. Ga. 1986).......................................................................... 18

*Omega Psi Phi Fraternity, Inc. v. HCE Grp. of Co.*, No. 11-cv-80479, 2011 WL 13228098 (S.D.
  Fla. Oct. 19, 2011) ........................................................................................... 19

*Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*,
  318 F.3d 1284 (11th Cir. 2003) ............................................................................. 16

*Phillips v. Frey,*
     20 F.3d 623 (5th Cir. 1994) ............................................................................... 10

*Physicians Interactive v. Lathian Sys., Inc.,*
     No. CA 03-1193-A, 2003 WL 23018270 (E.D. Va. Dec. 5, 2003) .......................... 7

*Premier Lab Supply, Inc. v. Chemplex Indus., Inc.,*
     10 So. 3d 202 (Fla. Dist. Ct. App. 2009) ............................................................. 9

*Real-Time Labs., Inc. v. Predator Sys.,*
     757 So.2d 634 (Fla.Ct.App.2000) .................................................................. 8, 16

*Se. Mech. Servs., Inc. v. Brody,*
     No. 8:08-CV-1151-T-30EAJ, 2008 WL 4613046 (M.D. Fla. Oct. 15, 2008) ......... 13

*Sensormatic Elecs. Corp. v. TAG Co. US, LLC,*
     632 F. Supp. 2d 1147 (S.D. Fla. 2008) ............................................................... 11

*Sikes v. McGraw-Edison Co.,*
     665 F.2d 731 (5th Cir.1982) .............................................................................. 11

*Sun Crete of Fla., Inc. v. Sundeck Prod., Inc.,*
     452 So. 2d 973 (Fla. Dist. Ct. App. 1984) ......................................................... 8, 9

*Syntex Ophthalmics, Inc. v. Tsuetaki,*
     701 F.2d 677 (7th Cir. 1983) .............................................................................. 10

*Temurian v. Piccolo,*
     No. 18-CV-62737, 2019 WL 1763022 (S.D. Fla. Apr. 22, 2019) ............................ 4

*Unistar Corp. v. Child,*
     415 So. 2d 733 (Fla. 3rd DCA 1982) .................................................................... 7

*Whatley v. Merit Distribution Servs.,*
     No. CIV. A. 99-0166-CB-S, 2001 WL 228053 (S.D. Ala. Feb. 5, 2001) ................ 18

**Statutes**

FLA. STAT. § 688.002 ................................................................................... 3, 7, 11, 12

**Rules**

Fed. R. Civ. P. 56 .................................................................................... 1, 2, 3, 5

iv

**Treatises**

2 Callman, *Unfair Competition, Trademarks & Monopolies* § 14.07 (4th Ed.1982) ..................... 8

*Restatement (First) of Torts* § 757 (1939) .................................................................. 16

*Restatement (Third) of Unfair Competition* (1995) ................................................. 8, 16

Plaintiff Scanz Technologies, Inc. ("Scanz" or "Plaintiff"), by and through the undersigned counsel, pursuant to Fed. R. Civ. P. 56, hereby respectfully moves for entry of partial summary judgment for Plaintiff on its trade secrets causes of action (counts I and II of the Complaint) on the questions whether trade secrets exist and were misappropriated by the Defendants, as well as alter ego liability. Scanz also respectfully requests an evidentiary hearing on its claim of fraudulent concealment of Scanz' causes of action by Defendants' counsel, should the Defendants' statute of limitation defense not be resolved now at the summary judgment.

**Preliminary Statement**

This motion for partial summary judgment presents what is an unprecedented case of trade secret theft involving expert testimony and defense admissions that overwhelmingly show a *deliberate* pirating by the Defendants of Scanz' trade secrets the Defendants accessed pursuant to the parties' license agreement.  This Motion will necessarily result in a significant reduction of trial-time if resolved favorably to Plaintiff, because the issue of Defendants' incessant *and admitted* pirating of each and every piece of Plaintiff's product-functionality—an issue that would take up days or weeks of trial time—has now been established in a way well beyond the judicially created precedential hurdles for summary judgment in similar cases.

**Relevant Background**

On July 17, 2020, Scanz filed its complaint in this matter, alleging that the Defendants conspired to steal Scanz' assets and trade secrets to create its own market analysis platform ("Complaint"). DE1. As alleged in the Complaint, Scanz and Defendant Jewmon had entered into a license agreement in 2013, whereunder Jewmon would offer client-stock-traders a desktop market analysis platform via "white label" at a website Jewmon allegedly owned ("license agreement" or "agreement"). *Id.*, at ¶ 26. The parties terminated the agreement in April of 2015,

1

and Jewmon agreed to be bound by numerous prohibitions that the parties expressly agreed survived the license agreement. *Id*., at ¶ 30. Following an investigation, Scanz learned in about 2018 that Jewmon's successor, StocksToTrade.com, Inc. ("STT"), had developed a market analysis platform that was substantially identical to Scanz' platform.

On October 5, 2020, the Defendants moved to dismiss the Complaint and for the Court to take judicial notice of certain Tweets. DE39-DE42. On January 7, 2021, the Court found, *inter alia*, that Scanz adequately alleged its trade secrets causes of action. DE56. The Defendants asserted during discovery that Scanz failed to reasonably identify the trade secrets for purposes of discovery, which this Court rejected. DE99.   The Defendants provided extensive discovery and Scanz has retained multiple expert witnesses to assist in its evaluation.  This Motion follows.

## MEMORANDUM OF LAW

### Legal Standards

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). In determining whether to grant summary judgment, the Court must consider "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248.

2

The moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See, e.g., Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Once this burden is met, it shifts to the non-moving party to present evidence that a genuine issue of material fact precludes summary judgment. *See* FED. R. CIV. P. 56(e).

The Florida's Uniform Trade Secrets Act ("FUTSA") defines a "trade secret" as information that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and...[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." FLA. STAT. § 688.002(4). To establish a violation under FUTSA, a plaintiff must prove that: "(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy and (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001).

Similarly, the Defend Trade Secrets Act ("DTSA") describes a trade secret as any information about which: (1) the owner has taken reasonable measures to keep secret; and (2) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. *See Matrix Health Grp. v. Sowersby*, No. 18-61310-CIV, 2019 WL 4929917, at *6 (S.D. Fla. Oct. 7, 2019).

Because the analyses under FUTSA and DTSA are substantially identical, courts ordinarily analyze them together. *See*, *e.g.*, *Temurian v. Piccolo*, No. 18-CV-62737, 2019 WL 1763022, at *10 (S.D. Fla. Apr. 22, 2019); *Matrix Health*, 2019 WL 4929917, at *6.

I.    **Introduction: The Issues Presented Can Be Properly Resolved at Summary Judgment**

As an initial matter, while Scanz is mindful of the reality that the question "[w]hether something is a trade secret is a question typically resolved by a fact finder after full presentation of evidence from each side," *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 (11th Cir. 2020) (citation and internal quotation marks omitted), it is also settled that the Court can properly determine the existence of a trade secret and its misappropriation in summary judgment proceedings on the appropriate record. *See, e.g., id.,* at 1310–11 (holding that "[t]he magistrate judge found [at summary judgment] that [plaintiff's] Transformative Database was a trade secret, a finding that is not clearly erroneous…"), and *see*, *id*., at 1314–15 (reversing magistrate's finding that defendants did not improperly use the trade secrets).

Indeed, this Court noted at the April 15, 2021 hearing that "the appropriate way in a case like this ultimately is going to be about how the expert can put this together and give you a cogent explanation as to why anything here is, in fact, a trade secret and how it was copied." DE99:27. This Motion rests largely on expert testimony and other competent evidence, not unlike the type of testimony to be presented at a trial. "[O]n matters involving trade secrets or confidential information, 'a motion for summary judgment is the 'functional equivalent' of a trial….'" *KW Plastics v. U.S. Can Co.,* No. CIV. A. 99-D-286-N, 2001 WL 237306, at *1 (M.D. Ala. Jan. 20, 2001) (citation omitted). "Summary judgment has 'an important, and ever increasing, role in stemming the tide of explosive litigation, greatly congested dockets, increasing delay in claims being adjudicated, and spiraling—indeed, unimaginable litigation costs.'" *Id*., at *1 (citing

4

*Calpetco v. Marshall Exploration, Inc.,* 989 F.2d 1408, 1415 (5th Cir.1993)). The efficient pre-trial resolution of these issues would substantially reduce the time and cost expended at trial and, if resolved favorably to Scanz, would only leave the limited questions of damages and conspiracy under these causes of action for the jury.[1]

 Furthermore, though discovery has not yet closed at the time of the filing of this Motion, the Defendants have caused significant delay in the discovery process and, as a result, Defendants have, to date, withheld information Scanz requested and have yet to conduct depositions on the merits in the coming days as a result of their tactics, as more fully set forth in Plaintiff's Motion for Leave to Amend filed concurrently herewith. Thus, at most, Scanz would arguably be prejudiced by the Defendants' tactics, not *vice versa*. And though Defendants have, to date, refused to produce any source code, which makes it difficult for Scanz to determine the full *extent* of their theft, Scanz presents more than sufficient evidence of improper acquisition and use. Irrespective of these disputes, the Federal Rules of Civil Procedure make clear that a motion for summary judgment may be filed "*at any time* until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b) (emphasis added). For these reasons, this Motion is not premature.[2]

///

---

[1] The time of Plaintiff's discovery of its trade secrets causes of action and its claim of fraudulent concealment delaying its discovery of its claims are addressed in the Request for Evidentiary Hearing filed herewith and in section 5 of the Separate Statement of Undisputed Facts, and Exhibit 27 hereto.

[2] However, should the Defendants seek a brief stay of this Motion until after the June 15, 2021 discovery cutoff, Plaintiff would not oppose such a request.

## II.   The Evidence Establishes the Existence of Trade Secrets Which Defendants Acquired By Improper Means

### A.  There Can Be No Genuine Dispute that Trade Secrets Are At Issue Which Possess Independent Economic Value

Brian Berg, who has extensive experience in the field,[3] finds that "the password- and subscriber-protected UI and UOTS of EF,[4] along with its multitude of options and drop-downs that allow selection of on the order of 90 parameters, are valuable trade secrets of Plaintiff, and from which Plaintiff derives significant value.  EquityFeed appears to have built a valuable niche in this marketplace that is trade secret-protected based on my experience." Berg Decl., at ¶220. He explains that that "the combinatorial structure of Plaintiff's trade secrets provides a perspective of the complexities of Plaintiff's software and product, and thus the tremendous amount of time that was necessary to conceive, design and implement Plaintiff's EF product." *Id.*, at ¶33. He concludes that Scanz' "*novel user interface design enables sophisticated analysis of the securities industry in real time, thereby enabling for-profit trading decisions*." *Id.*, at ¶30. "An instinctive and efficient UI can enable better results in a time efficient manner, and is critical to the success of a product." *Id.*, at ¶31. He enumerates "[s]ome key decisions" and "designs" that make Scanz' platform "powerful and user friendly" at ¶32 of his declaration.

The declaration of Stephan Touizer, owner and CEO of Scanz, also describes why Plaintiff's market analysis platform was difficult and time-consuming to develop, and that Plaintiff was the first in the industry to create a platform that allowed traders to conduct stock searches with real time results in such detail, and that its platform and especially its stock scanner functionality

---

[3] *See*, Berg Decl., at sections II & IIIC and Ex. BB2 thereto.
[4] "EF," as sometimes used herein, refers to EquityFeed nna Scanz; "UI" refers to user interface, and "UOTS" refers to user options trade secrets.

and design (sometimes referenced herein as "EF stock scanner"), was the most user-friendly while also providing a uniquely wide array of options to customize searches. *See* Touizer Decl.

The Eleventh Circuit in *Compulife Software*, 959 F.3d 1288 recently affirmed the lower court's finding at summary judgment that a trade secret existed and reversed the finding that no improper use occurred. It cautioned that even "hacking a public-facing website with a bot amount[s] [to] 'improper means'" *despite* a failure "to place a usage restriction on [the] website." *Id*., at 1288, 1314–15 (citing *Physicians Interactive v. Lathian Sys., Inc*., No. CA 03-1193-A, 2003 WL 23018270, at *2 (E.D. Va. Dec. 5, 2003) (entering injunction based on plaintiff's trade secret claim that defendants used robots for purposes of "searching, copying, and retrieving functions on [plaintiff's public] website[]")). The Court also held that

> the magistrate judge failed to consider the important possibility that so much of the Transformative Database was taken—in a bit-by-bit fashion—that a protected portion of the trade secret was acquired. … Even if quotes aren't trade secrets, taking enough of them *must* amount to misappropriation of the underlying secret at some point. Otherwise, there would be no substance to trade-secret protections for "compilations," which the law clearly provides.

*Id*., at 1314 (emphasis added and in original) (citing, e.g., Fla. Stat. § 688.002(4) ("'Trade secret' means information, including a ... compilation."); *Unistar Corp. v. Child*, 415 So. 2d 733, 734 (Fla. 3rd DCA 1982) (holding that a "distillation of" publicly available information amounts to improper means of acquiring protectable trade secret)).

In *Jadael Inc. v. Elliott*, No. 6:05-CV-1623-ORLDAB, 2007 WL 2480387 (M.D. Fla. Aug. 29, 2007), plaintiff's stock market analysis tool was held to be a trade secret. *Id*., at *2. Plaintiff developed its system "based on a combination of indicators, particular frequencies, and charts that [plaintiff's founder] determined were effective based on his experience and research." *Id*. Plaintiff alleged "that Defendants copied [its] Trading System by using indicators that mimic [its trading

system],″ though plaintiff itself even "took some components of the [*defendants'*] trading system" to use in its system. *Id.*, at **3, 8. The court noted that "a particular combination of charts, methods, and indicators … may be considered unique," *id.*, at *2, and explained that "a defendant is liable for use of a trade secret 'with independently created improvements or modifications if the result is substantially derived from the trade secret ...'" *Id.,* at *8 (citing Restatement (Third) Of Unfair Competition § 40 cmt. c (1995); *Real-Time Labs., Inc. v. Predator Sys.,* 757 So.2d 634, 637 (Fla.Ct.App.2000)).

In *Biodynamic Techs., Inc. v. Chattanooga Corp.,* 644 F. Supp. 607 (S.D. Fla. 1986), the Court granted summary judgment for plaintiff on its trade secrets cause of action, and flatly rejected the defendants' claims that "an unpatented, publicly sold product can be freely copied, down to the last detail, with impunity;" that, "where a claimed trade secret is embodied by the product itself, the secret is lost when the product is marketed and sold to the public;" and that the "purchase of a publicly sold product does not constitute a disclosure of 'confidential information.'" *Id.*, at 610. It concluded that "[t]he principle that because a secret is of such a nature that it can be discovered by lawful means does not deprive its owner of a right to protection from those who obtain it unlawfully is not only generally accepted, it is also sagacious." *Id.*, at 611.

"A trade secret is a plan or process, tool, mechanism or compound. It includes a unique combination of otherwise known components, *if the combination differs materially from other methods known in the trade.*" *Sun Crete of Fla., Inc. v. Sundeck Prod., Inc.*, 452 So. 2d 973, 975 (Fla. Dist. Ct. App. 1984) (emphasis added) (2 Callman, *Unfair Competition, Trademarks & Monopolies* § 14.07 (4th Ed.1982)). Thus, courts have held that information derives independent economic value and can be deemed to not be generally known if plaintiff can show that its mechanism or product materially differs from others in the industry. That is precisely the case

here, as proven by the expert declarations of Brian Berg and Dr. Anthony Hayter, a highly experienced statistician and full professor at the University of Denver in the Department of Business Information and Analytics, as well as the Touizer Decl. Even Defendant Timothy Sykes ("Sykes") testified that what makes STT's platform special is the "whole combination" of components and that "[e]very, single component matters." Ex. 1 (transcript of deposition of Timothy Sykes) (Tr., at 232).

And given the extent of copying in this case—making the two platforms, including the highly customized scanner functionality, nearly identical—and the fact that Scanz and STT's platforms remarkably stand out in the industry, as discussed in section III, *infra*, the Defendants can hardly dispute that Scanz' functionality and design do not derive economic value, as the Defendants would essentially argue that its own platform does not possess any independent economic value not generally known in the industry, which is, of course, contrary to STT's public representations about its platform. *See, e.g.,* Ex. 2, p. 273 (excerpt of *The Complete Penny Stock Course*, by Jamil Ben Alluch,[5] 2018) (claiming that STT offers proprietary stock filtration functionality); and *see*, Ex. 3, at 60, 140, 142 (prior draft of the *Penny Stock* book produced by Defendants, explaining why "Equity Feed is one of the most advanced real-time scanners available on the market." This language was removed from the final version of the book).

In *Premier Lab Supply, Inc. v. Chemplex Indus., Inc.,* 10 So. 3d 202 (Fla. Dist. Ct. App. 2009), the court found that FUTSA's independent-value component was met based on testimony about the unique design of plaintiff's machine and "the difficulty [plaintiff] faced in figuring out the precise measurements and ratios to obtain the desired result." *Id*., at 205–06 (citing *Sun Crete of Fla.,* 452 So.2d 973  (affirming preliminary injunction and finding that plaintiffs adequately

---

[5] Ben Alluch is the admitted hacker JewMon hired to perfect the theft of Plaintiff's trade secrets.

demonstrated through testimony that their complicated process for covering concrete surfaces amounted to a trade secret notwithstanding the availability of some of the raw materials to others in the field)); *Jadael*, 2007 WL 2480387, at *2 (accepting that plaintiff's market analysis tool was unique because the "combination of indicators, particular frequencies, and charts that [plaintiff] determined were effective based on his experience and research."); *Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, No. 3:13 CV-82-CRS, 2018 WL 4688737, at *5 (W.D. Ky. Sept. 28, 2018) ("in a number of trade secret cases, economic value has been recognized and trade secret protection afforded to information consisting of a process derived from years of trial and error research….."). The Berg, Hayter and Touizer declarations more than sufficiently establish the independent economic value of Scanz' trade secrets.

In short, though what constitutes a trade secret can be a complex question, courts have nevertheless determined the existence of a trade secret when so established by competent evidence and no genuine issue existed. *See also, e.g.*, *Phillips v. Frey*, 20 F.3d 623, 629 (5th Cir. 1994) (affirming summary judgment for plaintiff for trade secret misappropriation, holding that "[a] process or device may be a trade secret even where others can gain knowledge of the process from studying the manufacturer's marketed product."); *Lee v. Cercoa, Inc.,* 433 So. 2d 1, 2 (Fla. Dist. Ct. App. 1983) (affirming injunction against defendant in trade secrets case, *inter alia*, because trial court's "factual findings that the *combination of elements into a complicated production process* amounted to a trade secret" were not erroneous) (emphasis in original); *Syntex Ophthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 684 (7th Cir. 1983) (affirming injunction against defendants in finding that "[a] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable

10

secret.") (citing *Imperial Chemical Industries, Ltd. v. National Distillers & Chemical Corp.*, 342 F.2d 737, 742 (2d Cir.1965); *Sikes v. McGraw-Edison Co.*, 665 F.2d 731 (5th Cir.1982)).

Scanz has sufficiently established the existence of its trade secrets under FUTSA and DTSA.

### B.  The Defendants Acquired Scanz' Trade Secrets by Improper Means

There is no question that the Defendants had a duty to abide by the terms of the license agreement, which provides, in pertinent part, that, "[d]uring the term of this Agreement, neither JewMon nor its principals shall, directly or indirectly, offer any other real-time, market data and analysis platform to its customers or have any involvement or interest in, directly or indirectly, any other real-time, market data and analysis platform. After termination of this Agreement, … JewMon shall not utilize any portion of the Software and shall not copy the 'look and feel' of the Software/Website." Ex. 4, at 5, ¶ 15. Based on newly discovered evidence, there is also no dispute that, unbeknownst to Plaintiff, the Defendants pirated its trade secrets during the term of the license agreement. *See* section III, *infra* (discussing extensive evidence of copying and use).

The definition of "improper means" under FUTSA includes "breach or inducement of a breach of a duty to maintain secrecy." Fla. Stat. § 688.002(1) (2008). Under this standard, courts have found that acquisition occurred by improper means where the defendants, as here, violated pertinent provisions of a license agreement. *See, e.g., Sensormatic Elecs. Corp. v. TAG Co. US, LLC,* 632 F. Supp. 2d 1147, 1185–86 (S.D. Fla. 2008), *aff'd in part sub nom. Sensormatic Elecs., LLC v. Kahle*, 367 F. App'x 143 (Fed. Cir. 2010) (holding that defendant's "acquisition of [plaintiff's trade secrets] was through improper means, in violation of FUTSA" through a breach of the license agreement and/or employment agreement defendant entered into).

11

"The concept of 'improper means'—which under FUTSA may apply in both the acquisition and use contexts" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Compulife Software*, 959 F.3d at 1311 (citing Fla. Stat. §688.002(1)). "Moreover, the inadequacy of measures taken by the trade-secret owner to protect the secret cannot alone render a means of acquisition proper. So long as the precautions taken were reasonable, it doesn't matter that the defendant found a way to circumvent them. Indeed, even if the trade-secret owner took *no* measures to protect its secret from a certain type of reconnaissance, that method may still constitute improper means." *Id.,* at 1311–12 (emphasis added). "[M]isappropriation occurs whenever a defendant acquires the secret from its owner 'without his permission at a time when he is taking reasonable precautions to maintain its secrecy.'" *Id*., at 1312 (citing *E. I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1014 (5th Cir. 1970)). And, again, the evidence of copying and improper use is unprecedented in this case, as discussed in section III *infra*.

## C. Scanz Took Reasonable Steps to Protect Its Trade Secrets

As shown in section IIB, *supra*, the Defendants owed a duty to maintain Scanz' trade secrets confidential under the terms of the license agreement and termination notice. *See* Exhibits 4 and 5. Such agreements have been held to constitute a reasonable step to protect the trade secrets. *See, e.g., Geodetic Servs., Inc. v. Zhenghzou Sunward Tech. Co.*, No. 8:13-CV-1595-T-35TBM, 2014 WL 12620804, at \*4 (M.D. Fla. Apr. 4, 2014) (entering default judgment, *inter alia*, because plaintiff "took reasonable steps to protect [trade secrets], including [through] a confidentiality agreement.").

Furthermore, courts have routinely held that password protection and confidentiality covenants, as imposed on Scanz' subscribers, *see* Touizer Decl., ¶3, and Ex. 6, are reasonable

measures to maintain the secrecy of its assets. *See, e.g., Se. Mech. Servs., Inc. v. Brody*, No. 8:08-CV-1151-T-30EAJ, 2008 WL 4613046, at *12 (M.D. Fla. Oct. 15, 2008) (entering preliminary injunction, in part, because plaintiff proved it made reasonable efforts to protect its trade secrets through "confidentiality policy and …. password protection") (citation omitted); *In Mapei Corp. v. J.M. Field Mktg., Inc*, 295 So. 3d 1193, 1197 (Fla. Dist. Ct. App. 2020) (affirming injunction based, in part, on the trial court's finding that the defendant "knew that it was observing the functionality of a password protected website….").

Partial summary judgment against Defendants is also appropriate because, as the Eleventh Circuit recently reiterated, a defendant may be liable "even if the trade-secret owner took *no* measures to protect its secret …." 959 F.3d at 1311–12. In other words, evidence of improper acquisition can outweigh the importance of showing that a plaintiff took measures to protect its trade secrets. *Id*. Because the steps Scanz took have been held to be reasonable as a matter of law, and the evidence of improper acquisition is overwhelming, *see* section III, *infra*, this question must be resolved against the Defendants.

### III.    The Evidence of Copying and Use of Scanz' Trade Secrets by the Defendants Is Undisputed and Overwhelming

In his declaration, Mr. Berg discusses in detail "35 ways in which the two tools are identical and/or nearly so….," which are not exhaustive but representative examples. Berg Decl., at section VIII. Mr. Berg has no doubt that "***very large portions of [the EF stock scanner] have been misappropriated***" by the Defendants. *Id*., at ¶34 (double emphasis in original). Similarly, Dr. Hayter concludes that the operating structures of the two platforms is virtually identical. Hayter Decl., at section III and Figures 1 & 2. Also striking is the testimony of Brian Berg that, when compared with other competitors in the industry, the only two substantially identical market analysis platforms are those of Scanz and STT, and that even the platforms Defendants claimed

13

had similar functionalities are, in truth, "dramatically different." Berg Decl., at section IX, e.g., at ¶¶ 151, 165, 175, 182, 192, 200, 206, 211, 216; *see also*, ¶218b (finding that no other competitor "came close to duplicating [the EF stock scanner], including its ease of use").

Dr. Hayter breaks down the variable matches between Plaintiff's platform with STT and other competitors and concludes that the portion of variables in product used between STT and Plaintiff's platform is 85.5%, whereas the variable matches between STT's platform and other competitive platforms range from 0.0% to 3.0%. Hayter Decl., at Figure 3, section IV. Dr. Hayter concludes that the "data are clearly consistent with and supportive of the assertion that [Plaintiff's stock scanner] was used as an input to or as a basis for the construction of [Defendants' STT stock scanner]." Hayter Decl., at ¶20.

Defendant Zachary Westphal, JewMon's principal, testified that JewMon "had began (sic) designing or developing [its competitive platform] prior[] [to the termination of the license agreement]." Ex. 7 (Tr., at 117-118, 133, 139). *See also*, Ex. 8, at 3 (admission that JewMon hired Scopic Software during the term of the license agreement to develop a competitive market trading platform). Indeed, the bold theft can be gleaned from Scopic's billing summaries, which unequivocally reveals notes about Defendants' specific efforts—conducted in secret and covertly—to replicate Plaintiff's crown jewel trade secret, its unique stock scanner, prior to termination of the license agreement. Ex. 9.

Moreover, communications with Scopic show more flagrant efforts to copy Plaintiff's platform. *See, e.g*., Ex. 10 (ST33636) (Ben Alluch instructing Scopic that "the simplest solution would be to do like (sic) [EquityFeed] does"); Ex. 11 (ST218441) ("Side by Side comparison made with EquityFeed for same filter parameters"); Ex. 12 (ST218438-ST218439) (instructing to "follow the idea" but "the title 'EquityFeed' is not applicable"); Ex. 13 (STT24432) ("[EF stock

scanner] is very very complex…. Do we need to replicate this exactly?"); Ex. 14 (ST218472-ST ST218474) (noting that improvements are required to make STT more like Plaintiff's platform); Ex. 15 (STT24559) (comparing "data" received from EF platform); Ex. 16 (ST24867) (discussing changing name of the custom EF stock scanner Defendants' copied).[6]

Ben Alluch testified that he frequented Plaintiff's platform "to see how they're doing, you know, if they're coming up with anything new that might be interesting," Ex. 17 (Tr., at 77), and that the Defendants "replicated to the best of [their] ability some of those features." *Id*. (Tr., at 79). When Ben Alluch was asked how the features between the two platforms differed if Defendants "replicated [them] to the best of [their] ability," Ben Alluch responded he was "not sure," *id*. (Tr., at 79, 82), but later admitted that the "functionality … is similar." *Id*. (Tr., at 133). At a second deposition, Ben Alluch admitted he sent screen shots and videos of Plaintiff's platform to Scopic. Ex. 18 (Tr., at 217-234).

Ben Alluch also testified that he "may have looked and compared to make sure things were not too close, … [b]ecause … it's preferable not to have too much resemblance when, you know, creating features similar in nature." *Id*. (Tr., at 197-199). At least in the context of copyright infringement, courts have recognized that methodical modifications made by the defendant to the pirated work can necessarily constitute *further* proof of willful copying. *See, e.g., Concord Fabrics, Inc. v. Marcus Bros. Textile Corp.*, 409 F.2d 1315, 1316 (2d Cir. 1969) (finding that, "the very nature of the[] differences [between the works] only tends to emphasize the extent to which the defendant has deliberately copied from the plaintiff."); *Malibu Textiles, Inc. v. Label Lane Int'l, Inc.,* 922 F.3d 946, 953–54 (9th Cir.) (holding that "knowing modifications … could be evidence

---

[6] These documents and other exhibits referenced herein produced by Defendants marked "highly confidential." A motion to file these exhibits under seal is filed concurrently herewith.

of willful copying."). Analogously, the Defendants' calculated attempt to make only minor modifications during the course of their now *admitted* efforts to copy Plaintiff's trade secrets only supplies *more evidence* of unlawful copying. At a minimum, "the evidence suggests that the defendants could not have produced their product without the use of the plaintiff's trade secret." *Real-Time Lab'ys*, 757 So. 2d at 637.

Notably, "the bar for what counts as 'use' of a trade secret is generally low." *Compulife Software*, 959 F.3d at 1313. "There are no technical limitations on the nature of the conduct that constitutes 'use' of a trade secret.... [M]arketing goods that embody the trade secret, employing the trade secret in manufacturing or production, [and] relying on the trade secret to assist or accelerate research or development ... all constitute 'use.'" *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1293 (11th Cir. 2003). Trade secret misappropriation also occurs when information is used "to assist or accelerate research or development." *Id.*, at 1292 (citing *Restatement (Third) of Unfair Competition* (1995)). "The unauthorized use need not extend to every aspect or feature of the trade secret; use of any *substantial portion* of the secret is sufficient to subject the actor to liability. Similarly, the actor need not use the trade secret in its original form. Thus, an actor is liable for using the trade secret with independently created improvements or modifications if the result is *substantially derived* from the trade secret." *Id.*, at 1292–93. *See also, e.g., Real-Time Lab'ys,* 757 So. 2d at 636, 637 (a defendant is still liable if it "altered, modified or improved [plaintiff's] design") (citing *Forest Laboratories, Inc. v. Pillsbury Co.,* 452 F.2d 621, 625 (7th Cir.1971); *Restatement (First) of Torts* § 757, comment (c), p. 9 (1939)).

It is rare for a plaintiff to present a *statistical impossibility* that the Defendants did not copy Plaintiff's trade secrets. *See* Hayter Decl., ¶36 (concluding that statistical probability that the 35 exemplary matches Brian Berg identified "occurred purely by chance without [Plaintiff's stock

scanner] being used as an input to or as a basis for the construction of [Defendants' stock scanner] … is less than one chance out of 34 billion."). Furthermore, the Defendants have produced evidence in which they plainly *concede* to having copied substantial portions of Plaintiff's market analysis platform. The evidence of misappropriation is overwhelming in this case, leaving no genuine dispute of material fact on these issues. Scanz is entitled to partial summary judgment as a matter of law.

### IV.     The Failure to Impose Alter Ego Liability Would Produce an Inequitable Result

Though "the alter ego issue is heavily fact-specific, … alter ego liability may be decided on summary judgment." *Eckhardt v. United States*, 463 F. App'x 852, 856 (11th Cir. 2012) (citing *Miller v. Harco Nat'l Ins. Co.,* 241 F.3d 1331, 1332–33 (11th Cir.2001) (affirming grant of summary judgment for plaintiff on alter ego theory). "Piercing the corporate veil is proper if the corporation is a mere device or sham to accomplish some ulterior purpose, or is a mere instrumentality or agent of another corporation or individual owning all or most of its stock, or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose." *Id.,* at 855–56  (citation omitted). "To pierce the corporate veil in Florida, a claimant must establish: (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant." *Id.* (citing *Gasparini v. Pordomingo,* 972 So.2d 1053, 1055 (Fla.Dist.Ct.App.2008)). Furthermore, "[i]mproper conduct exists where a corporation is used 'as a subterfuge to mislead or defraud creditors, to hide assets, to evade the requirements of a statute or some analogous betrayal of trust." *Id*., at 856 (citing *Lipsig v. Ramlawi,* 760 So.2d 170, 187 (Fla.Dist.Ct.App.2000)).

The undisputed evidence reflects that the corporate Defendants share two principal places of business, one of which Defendants admit is the apartment of the Sykes family (Sykes, his mother and stepfather). Ex. 1 (Tr., at 8-9). It is settled that evidence of "sharing a principal place of business" supports a theory of alter ego liability. *Century Sr. Servs. v. Consumer Health Ben. Ass'n, Inc.,* 770 F. Supp. 2d 1261, 1266 (S.D. Fla. 2011). Moreover, the ownership and management of the entities are nearly identical. Ex. 18 (Tr., at 199-200); Ex. 19. "Alter-ego status is found when two corporations have substantial identity of management, business purpose, operation, equipment, customers, and supervision, as well as ownership." *Whatley v. Merit Distribution Servs.,* No. CIV. A. 99-0166-CB-S, 2001 WL 228053, at *2 (S.D. Ala. Feb. 5, 2001).

Defendant Sykes, who is alleged to be the key figure in this scheme, testified that he does not know which entities he was a principal of, nor could he tell the difference between them. Ex. 1 (Tr., at 21 "I don't know the difference between Millionaire Media or Millionaire Publishing."), at 13-14, 38-39, 52 ("Again, I'm not familiar with the companies."), at 126, 279-280). Plaintiffs have been permitted to pierce the corporate veil where the defendants admitted "a general confusion as to exactly who was acting for which company when." *Najran Co. for Gen. Contracting & Trading v. Fleetwood Enterprises, Inc.,* 659 F. Supp. 1081, 1096 (S.D. Ga. 1986) (internal quotation marks omitted). *See also, id*., (Tr. At 191, 194-195 (claiming that his public statement that he does not "make any money from selling" STT's platform was purportedly based on his belief that "there was a big loss. And when this video was coming out …, the loss had started to decrease."); Ex. 20 (evidence that large and frequent cash deposits were made into Millionaire Media ("MM"), with sizable transfers to Sykes' charity, including as a "draw.") (e.g., lines 1135-43)).

Defendants STT formed in June 2015—eighth months before Defendants' competitive platform was launched, during which time it remained a dormant shell. Ex. 19, at 21; Ex. 7 (Tr., at 191). JewMon borrowed hundreds of thousands of dollars from MM to pay Scopic's bills to secretly build the competitive platform during the term of the license agreement, and JewMon continued to pay Scopic after the launch of the platform in February 2016 until March 2016, after which Scopic started billing STT. Ex. 21; Ex. 22. STT did not enter into an agreement with Scopic until May 7, 2016. Ex. 23. Sykes also made loans to these entities for which Defendants did not produce any documentation. Ex. 24. JewMon made use of STT's trademark for months. Ex. 25. *See also, e.g., MCI Telecommunications Corp. v. O'Brien Mktg., Inc.,* 913 F. Supp. 1536, 1542 (S.D. Fla. 1995) (alter ego was established where corporation lacked legitimate revenues and was funded by alter ego corporation "for the purpose of enabling [corporation] to pay bills as they came due."); *Omega Psi Phi Fraternity, Inc. v. HCE Grp. of Co.*, No. 11-cv-80479, 2011 WL 13228098, at *3 (S.D. Fla. Oct. 19, 2011) ("commingling funds of the corporation with funds of other corporations and with personal funds" is evidence of alter ego).

The transfer of the project from JewMon to STT was not an arm's length transaction but a "silent transfer" without paperwork, though STT inherited JewMon's $526,000 debt related to the project. Ex. 18 (Tr., at 187, 188-189, 192, 190-194). *See*, *MCI Telecommunications,* 913 F. Supp. at 1542 (corporate veil pierced where "the absence of documentation" showed the corporations were not at arms-length). JewMon announced uninterrupted transition to its new competitive platform within a matter of two weeks. Ex. 26; Ex. 7 (Tr., at 143-156). Defendants' platform was handed over to STT in an effort to circumvent the Defendants' obligations to Plaintiff under the license agreement. The evidence here strongly supports the conclusion "that failure to impose alter ego liability in the instant case would produce an inequitable result," *In re B.L.*

*Jennings, Inc.,* 373 B.R. 742, 761 (Bankr. M.D. Fla. 2007), and the evidence will prove to be "so one-sided that [Plaintiff] must prevail as a matter of law," *Anderson,* 477 U.S. at 251–52, 106 S. Ct. at 2512.

## CONCLUSION

For the foregoing reasons, the Court is respectfully requested to enter partial summary judgment in Plaintiff's favor on the issues of the existence of trade secrets and misappropriation by the Defendants, as well as alter ego liability.

Dated: June 7, 2021                      Respectfully Submitted,

                                         SQUIRE LAW GROUP, P.A.
                                         305 W. Atlantic Ave, Suite 5
                                         Delray Beach, FL 33444
                                         Phone: 888.788.8816
                                         Fax: 786.577.0425
                                         dlage@squirelawgroup.com

                              By:    */s/Gustavo D. Lage*
                                         Gustavo D. Lage
                                         Florida Bar No. 972551

                                     *Attorneys for Plaintiff Scanz Technologies, Inc.*

**Certificate of Service**

I hereby certify that on June 7, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Electronic Service List for this Case.

Dated: June 7, 2021                                    *s/Gustavo D. Lage*
                                                                        Gustavo D. Lage