**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI-DADE DIVISION**

------------------------------------------------------------------ x
:
SCANZ TECHNOLOGIES, INC. fka EQUITYFEED                            :
CORPORATION, a Canadian (Quebec) Corporation,                     :
                                                                  :
                        Plaintiff,                                :    **Case No. 20-cv-22957**
                                                                  :    **(RNS/EGT)**
            v.                                                    :
                                                                  :
JEWMON ENTERPRISES, LLC, *et al.*,                                :
                                                                  :
                        Defendants.                               :
                                                                  :
------------------------------------------------------------------ x

**DEFENDANTS' MOTION FOR SANCTIONS AND MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

MOTION ........................................................................................................... 1

PRELIMINARY STATEMENT ......................................................................... 1

FACTUAL BACKGROUND .............................................................................. 3

I.      Defendants' First Request for Production ............................................... 3

II.     Plaintiff Falsely Represents It "Produced All Responsive Documents" ................... 4

III.    Plaintiff Makes Misrepresentations During the April 15, 2021 Hearing ................ 5

IV.     Plaintiff Makes Misrepresentations in Its Verified Interrogatory Responses ............ 7

V.      Plaintiff's Eleventh Hour Production of Documents that Were Due on March 15
        and That Plaintiff and its Counsel Repeatedly Represented Did Not Exist ............... 8

VI.     The Special 30(b)(6) Deposition Further Exposes Plaintiff's Misconduct ................ 9

        A. Plaintiff's Failure to Preserve Relevant Information ................................. 9

        B. Mr. Touizer Led Plaintiff's Search Efforts ........................................... 10

        C. Plaintiff's Deficient Search for Responsive E-mails ................................. 11

        D. Plaintiff's Failure to Search for Slack Messages and Inexplicable
           Withholding of Highly Relevant Information ........................................ 12

        E. Plaintiff's Failure to Search for Responsive Videos ................................ 14

ARGUMENT ................................................................................................... 14

I.      Sanctions Must Be Imposed on Plaintiff and SLG Pursuant to Rule 26(g) and 28
        U.S.C. § 1927 ....................................................................................... 14

II.     Sanctions Should Be Imposed on Plaintiff Pursuant to Fed. R. Civ. P. 37(c) .......... 18

CONCLUSION ................................................................................................ 20

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aztec Steel Co. v. Fla. Steel Corp.*,
  691 F.2d 480 (11th Cir. 1982) ...................................................................................18

*Bernal v. All Am. Inv. Realty, Inc.*,
  479 F. Supp. 2d 1291 (S.D. Fla. 2006) ...........................................................14, 16, 17

*Chudasama v. Mazda Motor Corp.*,
  123 F.3d 1353 (11th Cir. 1997) .................................................................................15

*Dragon Jade Int'l, Ltd. v. Ultroid, LLC*,
  No. 8:17-cv-2422-T-27CPT, 2019 U.S. Dist. LEXIS 196144 (M.D.
  Fla. Nov. 12, 2019) ....................................................................................................20

*EEOC v. M1 5100 Corp.*,
  No. 19-cv-81320, 2020 U.S. Dist. LEXIS 117243 (S.D. Fla. July 2,
  2020) ....................................................................................................................14, 17

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
  846 F. Supp. 2d 1335 (N.D. Ga. 2012) .................................................14, 17, 19, 20

*Jaffe v. Bank of Am., N.A.*,
  No. 07-21093, 2008 U.S. Dist. LEXIS 128557 (S.D. Fla. Apr. 29,
  2008) ..........................................................................................................................19

*Johnson v. BAE Sys.*,
  4 F. Supp. 3d 62 (D.D.C. 2013) .................................................................................15

*Legault v. Zambarano*,
  105 F.3d 24 (1st Cir. 1997) ........................................................................................15

*Malautea v. Suzuki Motor Co.*,
  987 F.2d 1536 (11th Cir. 1993) .................................................................................17

*Mitchell v. Ford Motor Co.*,
  318 F. App'x 821 (11th Cir. 2009) ............................................................................18

*Norelus v. Denny's, Inc.*,
  628 F.3d 1270 (11th Cir. 2010) .................................................................................17

*Prior v. State Farm Fire & Cas. Co.*,
  No. 8:11-cv-01448-T-27TBM, 2013 U.S. Dist. LEXIS 196029 (M.D.
  Fla. Feb. 7, 2013) .......................................................................................................15

*R & R Sails, Inc. v. Ins. Co. of State of Pa.*,
   251 F.R.D. 520 (S.D. Cal. 2008) ...............................................................16

*Shortz v. City of Tuskegee*,
   352 F. App'x 355 (11th Cir. 2009) ............................................................18

*Taverna Imps., Inc. v. A&M Wine & Spirits, Inc.*,
   No. 15-24198-CIV, 2018 U.S. Dist. LEXIS 125906 (S.D. Fla. July 27,
   2018) .........................................................................................................17

*Tradeshift, Inc. v. BuyerQuest, Inc.*,
   No. 20-cv-01294-RS (TSH), 2021 U.S. Dist. LEXIS 78658 (N.D. Cal.
   Apr. 23, 2021) ..........................................................................................15

*Travelers Ins. Co. v. Commercial Cool-Temp Corp.*,
   No. 11-61748-DIMITROULEAS/S, 2012 U.S. Dist. LEXIS 201783
   (S.D. Fla. Sep. 5, 2012) ............................................................................20

*U & I Corp. v. Advanced Med. Design, Inc.*
   251 F.R.D. 667 (M.D. Fla. 2008) .......................................................19, 20

*Venator v. Interstate Res., Inc.*,
   No. CV415-086, 2016 U.S. Dist. LEXIS 50964 (S.D. Ga. Apr. 15,
   2016) ...................................................................................................15, 17

**RULES**

Fed. R. Civ. P. 26(e) ...........................................................................................18

Fed. R. Civ. P. 26(g) .......................................................................14, 15, 16, 17

Fed. R. Civ. P. 37(b) ...........................................................................................18

Fed. R. Civ. P. 37(c) .................................................................................18, 19, 20

Rule 37 ...................................................................................................................1

**STATUTES**

28 U.S.C. § 1927........................................................................................14, 17

## MOTION

Defendants JewMon Enterprises, LLC, Millionaire Media, LLC, Millionaire Publishing, LLC, StocksToTrade.com Inc., Timothy Sykes, and Zachary Westphal (collectively "Defendants") move for sanctions against Plaintiff Scanz Technologies, Inc. ("Scanz" or "Plaintiff"), and its counsel from Squire Law Group, P.A. ("SLG"), pursuant to Fed. R. Civ. P. 26(g), Fed. R. Civ. P. 37(c), and 28 U.S.C. § 1928.[1]

## PRELIMINARY STATEMENT

Plaintiff and SLG have consistently failed to satisfy even their most basic discovery obligations and have repeatedly made misrepresentations—in sworn and certified discovery responses, oral and written communications to Defendants' counsel, and statements to this Court—about the existence and availability of responsive information and the completeness of Plaintiff's document productions.  As previewed during the June 4, 2021 discovery conference and set forth below, Plaintiff's misconduct includes (i) failing to take required steps to preserve relevant electronically stored information ("ESI"), (ii) repeatedly representing—falsely—that all responsive documents had been produced when, in fact, Plaintiff had access to hundreds of additional responsive emails that it claimed had been "lost," (iii) failing to even search for ESI stored on the workplace messaging and collaboration platform known as Slack, despite Plaintiff's sworn statement that Slack is its "primary method" of business communication, and (iv) SLG's complete outsourcing of the document collection and review process to Plaintiff's founder and CEO, and failure to meaningfully supervise any aspect of that process.

Despite facing immediate questions from Defendants about the completeness of its production, Plaintiff and SLG not only failed to investigate and remedy the glaring deficiencies, but instead doubled-down and for months repeated their false assertions that all responsive documents had been produced or no longer existed.  Indeed, even after an April 2021 discovery hearing in which Judge Torres found certain representations made by SLG to be "a little hard to believe" and a potential "Rule 37 issue," Plaintiff's and SLG's false assurances continued for more than a month.

---

[1] SLG is one of four law firms representing Plaintiff in this matter.  While other of those firms participated in the subject discovery process, only SLG (which was Plaintiff's initial counsel and commenced this action) signed the discovery responses and made the direct misrepresentations to counsel and the Court that are at issue here.

It was only after the expenditure of substantial time and resources by Defendants to expose Plaintiff's misconduct—including the retention of a forensics expert, service of additional interrogatories and requests for production, and service of a subpoena on Plaintiff's e-mail server provider—that Plaintiff finally began to produce critical responsive documents, mere weeks before the June 15, 2021 fact discovery deadline.  Defendants were also forced to take a special 30(b)(6) deposition of the Plaintiff, which revealed that Plaintiff and SLG had lied in their earlier sworn statements and representations and exposed the existence of hundreds of more responsive documents that had inexplicably been withheld.  To this day, there remain significant concerns about the completeness of Plaintiff's document production, which contains unexplained multi-year gaps during the period in which Plaintiff was allegedly investigating the only two remaining claims in this lawsuit.

Plaintiff's misconduct has substantially prejudiced Defendants.  In addition to the significant expense incurred in connection with obtaining discovery to which Defendants were plainly entitled on March 15, Plaintiff's dilatory and obstructionist tactics have consistently forced Defendants to divert time and resources away from the substance of this litigation, and Plaintiff's late disclosures put Defendants in the position of preparing for multiple depositions and dispositive motion practice based on newly disclosed evidence that unquestionably should have been produced months ago when Plaintiff repeatedly certified that its document production was complete.

The Court should impose sanctions on Plaintiff and SLG to remediate the prejudice suffered by Defendants and deter future misconduct.  The Court has broad discretion to impose appropriate sanctions, and Defendants respectfully request that the Court award the following specific relief, along with any other relief the Court deems just and proper.  Defendants are entitled, on multiple independent bases, to reimbursement of their fees and expenses incurred as a result of Plaintiff's misconduct, including pursuant to Fed. R. Civ. P. 26(g) and 37(c) and 28 U.S.C. § 1927.  These reimbursable fees and expenses should include, at a minimum, those incurred in connection with (1) Defendants' numerous meet and confers and written correspondence concerning Plaintiff's failure to produce responsive electronic communications; (2) the April 15, 2021 telephonic discovery hearing; (3) the engagement of a forensic expert to assess Plaintiff's repeated claims that responsive e-mails had been "lost" and were not recoverable; (4) the preparation and service of a third-party subpoena on Plaintiff's e-mail server

provider and numerous calls and written correspondence regarding that subpoena; (5) the preparation of additional Interrogatories and Requests for Production directed at Plaintiff's failure to comply with its discovery obligations, (6) the June 2, 2021 Special 30(b)(6) Deposition of Plaintiff; and (7) this Motion, including any subsequent related briefing and argument.

*     *     *

Defendants' counsel gets no pleasure from bringing this Motion and does so only after taking every reasonable step—over many months—to stem Plaintiff's and SLG's persistent misconduct and abuse of the discovery process.   This is not a motion about routine discovery disputes, nor is it a tactic designed to gain an advantage in a hotly contested litigation.   The conduct in which Plaintiff and SLG have engaged has been outrageous, in plain violation of the discovery rules, and highly prejudicial to Defendants.   This is precisely the sort of misconduct the sanctions provisions of the Federal Rules and applicable laws are designed to remedy.   This Motion should be granted, Plaintiff and SLG should be sanctioned, and Defendants should be awarded the relief described below.

## FACTUAL BACKGROUND

## I.      Defendants' First Request for Production

On January 15, 2021, within days of the Court's dismissal of seven of the nine counts asserted in Plaintiff's complaint ("Compl.," ECF No. 1), Defendants served their First Set of Requests for Production of Documents on Plaintiff ("Defendants' First RFPs" or the "Requests", Ex. 1).[2]   The Requests defined "Document" to include both "electronically stored information" and "Communications," including "electronic mail," "instant-messenger service," and "social-media service."   (Ex. 1 at 3-4.)   The Requests, which sought material dating back to 2012, encompassed "all Documents subject to [Plaintiff's] control that are stored . . . on any electronic device or computer, on personal computers, personal email accounts, personal cell phones . . ., servers . . . and include any Documents stored with cloud technology which are in [Plaintiff's] actual or constructive, possession, custody or control."   (*Id.* at 5.) The Requests further instructed that Plaintiff should provide specified information if responsive Documents were not currently in Plaintiff's possession, custody, or control, or had been lost, deleted, or destroyed.   (*Id.* at 7.)

---

[2] Exhibit references are to the Declaration of Steven R. Campbell in Support of Motion for Sanctions, dated June 17, 2021, filed contemporaneously herewith.

## II.  Plaintiff Falsely Represents It "Produced All Responsive Documents"

On March 15, 2021, following a 30-day extension agreed to by Defendants, Plaintiff served its Amended Responses to the Requests ("Plaintiff's R&Os," Ex. 2).  Plaintiff produced documents concurrently with service of Plaintiff's R&Os and stated in response to all 47 requests that "Plaintiff has produced all responsive documents currently in its possession, custody and/or control." *See generally* Ex. 2.[3]  Plaintiff's R&Os were signed by one of its counsel from SLG, Elad Botwin, and verified under penalty of perjury by Stephan Touizer, the Founder and CEO of Plaintiff, to be "true and correct."  (*Id.* at 25-26.)

Notwithstanding Plaintiff's sworn statements that it had "produced all responsive documents," it was immediately apparent that Plaintiff's production suffered from significant deficiencies.  For example, with the exception of approximately 21 customer service messages (which appeared to have originated from a customer service feature on Plaintiff's website), Plaintiff did not produce a single e-mail or other electronic communication.  Nor did Plaintiff produce any social media posts, notwithstanding that RFP No. 28, which sought "[a]ll Documents concerning any public statements You have made concerning the License Agreement, and/or any Defendant," expressly referenced ten enumerated posts that Plaintiff had made on Twitter.  (*Id.* at 18.)  And, while Plaintiff believed at the time of production that all responsive emails before 2017 were lost, it did not disclose that information to Defendants. (6/2/2021 30(b)(6) Tr., Ex. 3, at 71:24-72:6.)

Defendants raised the "near-total absence of any emails or electronic communications," the lack of social media posts, and numerous other deficiencies in a letter to SLG on March 23, 2021.  (Ex. 4 at 3.)  On March 29, 2021, Mr. Botwin responded, representing that, "[w]ith respect to emails and electronic communications, ***Plaintiff has indeed produced everything in its possession, custody and control***."  (Ex. 5 at 5 (emphasis added).)  SLG also claimed for the first time that "any emails or electronic communications before approximately 2017 are missing" because Mr. Touizer's e-mails had been "corrupted" during an earlier attempt to back-up his e-mails and the data was "lost."  (*Id.*)  As Defendants would later learn—after serving additional interrogatories, participating in a discovery conference (in which Plaintiff repeated this claim),

---

[3] Plaintiff specified that it was withholding very limited categories of documents, specifically certain customer information in response to RFP No. 43, and particular documents on the basis of attorney-client privilege in response to RFP Nos. 25 and 46.

retaining a forensics expert, and subpoenaing Plaintiff's e-mail server provider—this was false. The purported corruption event had in fact occurred nearly a full year earlier, in the first quarter of 2016, and all "sent" e-mails from Mr. Touizer's account remained available on the server.

In the same letter, Mr. Botwin further represented that "Plaintiff has nonetheless conducted a search of all relevant documents within its network of staff and employees, but *there are no other responsive documents in terms of electronic communications*." (Ex. 5 at 5 (emphasis added).)   After Defendants again questioned the completeness of Plaintiff's productions, Mr. Botwin, on behalf of Plaintiff, accused Defendants of "speculation" and repeated the false representations that additional responsive documents did not exist:

- "Perhaps the most unfortunate objection that has arisen in the meet and confer process is your speculation that documents have been held back by Plaintiff. Nothing could be further from the truth."

- "Plaintiff is once again assuring you that the documents you believe exist are not documents in Plaintiff's possession, custody or control."

- "Your comments about missing documents are merely your own improper speculation as compared with our assurance to you that there are no such documents.   This includes your speculation that 'there should be responsive emails from 2017 to June 2020,' which conclusion by you is simply incorrect."

(Ex. 6 at 2-3.)

As set forth below, the only things that could not "be further from the truth" were the foregoing representations and Plaintiff's and SLG's "assurance to [Defendants] that there are no such documents."   In fact, at the time Plaintiff's counsel made these representations, Plaintiff possessed (at least) hundreds of responsive emails, as well as responsive electronic communications in the form of Slack messages that Plaintiff had not bothered to search, notwithstanding that, since 2014, Slack has been—according to Mr. Touizer's sworn testimony—Plaintiff's "primary method" of business communication. (Ex. 3 at 61:25-62:6, 151:19-152:4, 154:4-12, 343:22-25.)

### III.   Plaintiff Makes Misrepresentations During the April 15, 2021 Hearing

On April 15, 2021, a telephonic discovery hearing was held before Judge Torres (the "April 15 Hearing").   During the April 15 Hearing, counsel from SLG, Gustavo Lage, told the

Court that there were no additional e-mails beyond those that had been produced (the 21 customer service messages):

> THE COURT: [D]id you verify that you weren't able to locate any email from Mr. Touizer prior to 2017?
>
> MR. LAGE: We were not. We were not.
>
> . . .
>
> THE COURT: Okay. And then what about email communications with other people who worked for him.
>
> MR. LAGE: Your Honor, everything prior to that date is gone. . . .
>
> . . .
>
> THE COURT: So you're saying that there were no intercompany emails that related to this case in 2017 through 2020?
>
> MR. LAGE: To our knowledge, no, your Honor.
>
> THE COURT: That's a little hard to believe, no?
>
> MR. LAGE: Judge, I understand the Court and why your Honor has these concerns. But I can only tell you what I've seen and what I'm also told by my client. . . . That's something that they can put in front of the Court later on after discovery is complete and we're in front of a jury, if we get in front of a jury. . . .
>
> THE COURT: Well, actually, no. If we – we may not get that far if I don't believe it's plausible. You'll never see the trier of fact if I think it's implausible or if I think that there's some hanky panky going on. So first you have to satisfy me. And so based on your responses, I'm not satisfied. Let's put it that way.

(Ex. 7 at 38:12-41:9.) The Court's skepticism was well-founded. As Defendants would learn more than a month later—after continuing to challenge Plaintiff's representations and serving a third-party subpoena on Plaintiff's e-mail server provider—hundreds of the e-mails in question existed, as did hundreds of other responsive documents that had not been produced.[4]

---

[4] Mr. Lage also represented to the Court that his associate, Mr. Botwin, "went and met with Mr. Touizer and reviewed the computers and went out and accessed the computer system." (Ex. 7 at 39:18-23.) Those statements are directly contradicted by Mr. Touizer's sworn deposition testimony. *See* Ex. 3 at 59:16-19 ("Q. And did your counsel ever come to Canada and help you search for documents or look at your computer? A. No, not physically, no.").

During the April 15 Hearing, Defendants also raised their concern that Plaintiff had not produced any social media posts despite the fact that Defendants had identified and referenced ten specific responsive Twitter posts in RFP No. 28. Mr. Lage represented that there were no other documents responsive to RFP No. 28, which led to the following exchange:

> THE COURT: And are you saying – is [your client] going to say under oath that other than the ones that Defendants have identified, there are no other messages that are relevant to this license agreement of the Defendant?
>
> MR. LAGE: That is what our client has informed us of.
>
> . . .
>
> THE COURT: . . . *I'll stand on your representation that there's nothing else. But then if they find other things, it's just another fodder for impeachment of your client, and on a Rule 37 issue*. So I just want to make sure that you feel that you're comfortable with that answer.
>
> MR. LAGE: I am your Honor. But, you know, in an abundance of caution, at the Court's instruction, I will address it with my client once again.

(Ex. 7 at 52:12-53:9 (emphasis added).) Despite Mr. Lage's representation to the Court, more than 6 weeks passed and Plaintiff still failed to produce any documents responsive to RFP No. 28. It was not until June 6—following a hearing two days earlier in which Defendants disclosed to the Court that they had identified numerous additional social media posts and intended to move for sanctions—that Plaintiff finally provided Defendants with a list identifying links to 28 Twitter posts responsive to RFP No. 28. (Ex. 8.)

## IV. Plaintiff Makes Misrepresentations in Its Verified Interrogatory Responses

On May 7, 2021, Plaintiff served its Responses to Defendant Millionaire Media's First Set of Interrogatories ("Plaintiff's Interrogatory Responses," Ex. 9), which were focused on issues related to Plaintiff's preservation, collection, and production of documents. Like Plaintiff's R&Os, Plaintiff's Interrogatory Responses were signed by Mr. Botwin and verified under penalty of perjury by Mr. Touizer. (Ex. 9 at 14-16.) Plaintiff's Interrogatory Responses included multiple false statements about the completeness of Plaintiff's document productions, including in response to Interrogatory No. 6:

> Plaintiff has searched for any devices that may contain computer-based information . . . . *[T]he computer-based information already turned over in*

> ***discovery represents all possible responsive computer-based information in Plaintiff's possession, custody, and control.***

(*Id*. at 12 (emphasis added).)  And, in response to Interrogatory No. 8, which asked Plaintiff to "[i]dentify and describe all efforts You took to search for ESI that was responsive to one or more of the requests set forth in Defendants' First RFPs," Plaintiff responded:

> ***Plaintiff undertook extremely intensive ESI searches in order to respond to the First RFPs by looking through all relevant devices, servers and cloud locations*** as set forth in detail above . . . .  Other than the very significant informational production effectuated thus far, ***Plaintiff is unaware of any additional computer-based information of any kind in its possession, custody and control that is responsive to the outstanding requests made by the Defendants.***

(*Id*. at 14 (emphasis added).)  These statements were false.  At the time they were made, Plaintiff knew that it had not searched Slack, its "primary method" of business communication.   In addition, at the time Plaintiff's Interrogatory Responses were served, hundreds of responsive e-mails that had not been produced were available to Plaintiff on the server.  Despite this, on May 10, Mr. Botwin again falsely represented that there were no responsive e-mails:

> We do not understand your claim of deficiencies.   Plaintiff's business is comprised of a few employees who communicate regarding their core business. ***The relationship with your clients was not a core business item and did not merit anything other than non-email discussions.  You may not like that but it is true***.  Your desire to speculate about the way three human beings do business is interesting but irrelevant to this case.  ***There are no responsive emails.***  You have not carefully read our responses to these interrogatories.

(Ex. 10 at 2-3 (5/10/21 7:00 PM e-mail from Mr. Botwin) (emphasis added).)

## V.     Plaintiff's Eleventh Hour Production of Documents that Were Due on March 15 and That Plaintiff and its Counsel Repeatedly Represented Did Not Exist

On May 12, 2021, in light of the implausibility of Plaintiff's repeated representations to Defendants—and to the Court—that there were no additional responsive documents, Defendants, at the suggestion of their e-mail forensics expert, served a third-party subpoena on Plaintiff's e-mail server provider, Rackspace U.S., Inc. ("Rackspace") (the "Rackspace Subpoena," Ex. 11).  Remarkably, within three days of service, Plaintiff's counsel notified Defendants that certain of the purportedly missing e-mails had been located and suggested that there might be no need for a special 30(b)(6) deposition.  (Ex. 12 at 1 ("[M]y understanding is that Rackspace has recovered some existing e-mails in one of the folders . . . .  There would be no need to even proceed with

any such deposition if Rackspace's efforts have resolved the problem.").)  On May 20, Plaintiff produced hundreds of emails—more than 220 of which were from Mr. Touizer's account that had purportedly been corrupted, along with hundreds of additional e-mails from the customer service accounts from which Plaintiff had claimed to have completed production on March 15. (Ex. 3 at 307:5-11.)

Then, on the night of May 27, 2021—less than a week before the special 30(b)(6) deposition (discussed below)—Plaintiff, out of the blue, produced 70 documents containing messages from Plaintiff's Slack account.  To date, Plaintiff does not appear to have produced *any* Slack messages between February 17, 2016 and June 19, 2018.  The absence of electronic communications from this critical period, when Plaintiff was allegedly investigating its claims, (Compl. at ¶¶ 33-36), is extremely concerning, particularly in light of Mr. Touizer's testimony that his Slack messaging "really picked up in '16 when [Plaintiff's business] went remote."  (Ex. 3 at 157:23-158:3.)

## VI.    The Special 30(b)(6) Deposition Further Exposes Plaintiff's Misconduct

On June 2, 2021, Defendants conducted a special 30(b)(6) deposition of Plaintiff covering topics related to Plaintiff's document preservation efforts and productions in which Mr. Touizer testified as Plaintiff's corporate representative.  This deposition clearly revealed the extent to which Plaintiff had failed to comply with its discovery obligations, and the extent to which Plaintiff's counsel failed to exercise any oversight of the process.

### A.    Plaintiff's Failure to Preserve Relevant Information

On January 13, 2017, in response to a Tweet, Plaintiff publicly announced its intention to commence this lawsuit.  Asked "When do you plan to sue @StocksToTrade for copying your software?," Mr. Touizer responded from Plaintiff's Twitter account, "Already in the works," demonstrating that Plaintiff had contemplated litigation with Defendants since at least that time and had a duty to retain relevant information.  (ECF No. 42-5.)  Although Mr. Touizer provided vague and general assurances during his testimony that "careful attention" had "always" been paid through his "diligent attention" to preserving documents, (Ex. 3 at 374:3-375:14), the record—including the rest of his testimony—demonstrates otherwise.  Plaintiff does not have a document retention policy, (*id.* at 372:21-373:5), and as far as Mr. Touizer knows—*including to this day*—his e-mail has employed a "POP3 protocol format" that results in his e-mail being

automatically deleted from the server "every several days."  *See* Ex. 9 at 6-8 & Fig. 1 (describing POP3 and showing current settings); *see also* Ex. 3 at 249:14-253:5 (testifying regarding same). This is a setting that Mr. Touizer, himself, selected.  *See* Ex. 9 at 6 ("When he set up the Foxmail System, Mr. Touizer chose POP3."); *see also* Ex. 3 at 248:16-19 ("Q. When you set up the EM Client on your 2016 laptop, you chose POP3 again, correct? A. I believe it was set up again with POP3, yes.")  Mr. Touizer also testified that he has "definitely" deleted messages on Slack and, indeed, that "realtime deletion . . . is one of the innovative things Slack gives you that users really like."  (Ex. 3 at 229:7-25.)

Likewise, neither of Plaintiff's only two other employees were informed of a duty to preserve documents.  During his June 11, 2021 deposition, Ashot Temourians (Plaintiff's Chief Technology Officer) testified that he had *never* been told that he had a duty to preserve documents related to this litigation (which was filed in July 2020), that he deletes e-mails "[e]very day," and that it was "quite possible" he had deleted e-mails related to StocksToTrade. (Ex. 13 at 47:9-19; *see also id.* at 92:16-93:3 ███████████████████████████████ And Mikhail Seleznev (Plaintiff's Head Java Architect) ███████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████  (Ex. 14 at 20:13-14, 21:3-15.)

### B.  Mr. Touizer Led Plaintiff's Search Efforts

Plaintiff's efforts to search for documents responsive to Defendants' First RFPs was led by Mr. Touizer himself.  (Ex. 3 at 27:18-20, 296:16-18.)  Mr. Touizer is not a lawyer and does not recall having ever read any of the Federal Rules of Civil Procedure.  (*Id.* at 18:13-19:2.)  Mr. Touizer is also "no e-mail expert."  (*Id.* at 241:17.)  Until this matter, Plaintiff, which is a Canadian (Quebec) Corporation, had never been a party to a U.S. court proceeding, nor does Plaintiff employ anyone with a law degree.  (*Id.* at 18:4-12, 19:3-6.)  Despite all this, Plaintiff did not engage a third-party vendor to assist in the search or collection of documents.  (*Id.* at 59:5-15.)  In fact, aside from Mr. Touizer and Plaintiff's two other employees, nobody—including Plaintiff's counsel—was involved in Plaintiff's search for responsive documents.  (*Id.* ("Q. Besides from you, Mr. Temoureants, and Mr. Seleznev, was anyone else involved in Scanz's efforts to search for responsive documents between January 15 and March 15? A. No. Q. What about after March 15? A. No, not that I believe."); *see also id.* at 296:2-22 (testifying that Mr.

Touizer "was leading the search" and agreeing that nobody besides Messrs. Touizer, Temourians and Seleznev "was involved in the search and collection of documents on behalf of Scanz").

### C.   Plaintiff's Deficient Search for Responsive E-mails

Mr. Touizer was personally responsible for searching two of his e-mail accounts—stephan@equityfeed.com and stephan@scanz.com. (Ex. 3 at 22:16-25.)  To do so, Mr. Touizer assembled a "list of search terms," but—despite being Plaintiff's designated 30(b)(6) witness on the topic—could neither recall them in their entirety nor even recall whether he had looked at Defendants' First RFPs when he created the terms.  (*Id.* at 40:22-25, 41:13-23, 329:13-330:18.)  Mr. Touizer testified that, after he applied these terms to his e-mail accounts, he alone made relevance determinations, based on his "own intelligence." (*Id.* at 298:5-299:6.)  In addition, Mr. Touizer was solely responsible for interfacing with Rackspace to investigate whether any of his purportedly lost e-mails could be recovered from the server.  (*Id.* at 253:15-254:8 ("Q. Did anyone assist you in that [Rackspace] investigation or was it just you investigating? A. It was just me.").)  Based on his inquiry, Mr. Touizer incorrectly concluded that additional e-mails did not exist, notwithstanding that it was apparent from the information readily available to Mr. Touizer that the account contained 1.1GB of data, (*id.* at 275:9-21), a volume that he unequivocally agreed would comprise more than just the few days' worth of e-mails that Plaintiff had represented to Defendants was all that existed.  (*Id.* at 217:8-11 (Q. "Well, would you agree that . . . anything over 1 gigabytes would be more than several days' worth of e-mail? A. That's definite.").)

Mr. Touizer also testified that, *prior to March 15* (the date of Plaintiff's initial document production), he conveyed the search terms he created to Plaintiff's two other employees and directed them to search their own e-mails and make their own determinations—based on instructions from Mr. Touizer—as to whether e-mails that hit on a search term were relevant to this case. (Ex. 3 at 29:20-30:7, 34:12-35:11.)  This testimony is belied by Mr. Seleznev's June 4 testimony that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

██████████████████████████████   (Ex. 14, at 15:13-16, 17:10-19, 18:2-17, 19:23-20:2.)[5]

Mr. Touizer also stated multiple times under oath that Mr. Temouriants did not find relevant e-mails, (Ex. 3 at 29:11-19, 35:12-36:5), yet Mr. Temouriants testified that he had notified Mr. Touizer both in early 2021 and, again, at the end of May that he *had* identified e-mail hits after searching his computer, but had never been asked to provide the results of the search to Mr. Touizer.  (Ex. 13 at 45:5-47:3.)  Of course, Mr. Temouriants did have responsive e-mails and, less than 24 hours after Mr. Touizer testified there were none, Plaintiff produced an additional 150 documents, including dozens of e-mails from Mr. Temouriants' account.  Also included in that production were dozens of e-mails from an additional e-mail account used by Mr. Touizer—ceo@equityfeed.com—that he had testified the day before had not been searched.  (Ex. 3 at 221:3-222:8.)  Based on information obtained during the special 30(b)(6) deposition, Defendants requested that Plaintiff run additional searches on specified e-mail accounts, which resulted in the production of at least 65 new e-mails on the night of June 10.[6]

### D.    Plaintiff's Failure to Search for Slack Messages and Inexplicable Withholding of Highly Relevant Information

Prior to making its March 15 production, Plaintiff did not search for responsive communications on Slack, which Mr. Touizer has been using "as [his] primary method of business communication since [he] adopted it in 2014."  (Ex. 3 at 343:22-25; *see also id.* at 336:20-25 (Plaintiff did not search for Slack communications prior to March 15 because Mr. Touizer was "not aware that was a requirement"); *id.* at 61:25-62:6 (similar).)  It was not until more than two months later, on the eve of the special 30(b)(6) deposition, that Plaintiff made a belated production of Slack messages.  This, too, was incomplete.  Slack is "the primary method

---

[5] Incredibly, Mr. Touizer also claimed to not recall whether he had sent Mr. Seleznev the search terms in writing, (Ex. 3 at 41:24-42:2), ████████████████████████████████████ ████████████████   (Ex. 14 at 18:2-19:18.)  Plaintiff never produced these Slack messages, so Defendants still do not know what search terms Plaintiff used.

[6] This production followed the false representation, made a mere six days earlier by Raul Reichard, counsel from another one of the law firms representing Plaintiff, that, "as stated earlier today, the end result is that all documents have been produced . . . ."  (Ex. 15 at 1).  While Mr. Reichard also made misrepresentations regarding Plaintiff's discovery compliance, he did not certify false discovery responses, and Defendants do not seek sanctions against Mr. Reichard or his firm in this Motion.

of electronic communication between Scanz employees" and contractors, (*id.* at 154:4-12), yet the direct messages of Plaintiff's other employees were not searched. (*Id.* at 231:12-232:4; Ex. 14 at 24:13-16, 139:3-140:7 ███████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ Ex. 13 at 64:24-65:3 ████████████████████████████████████████████████████ ██████████████████████████████████████████████.

Plaintiff finally produced direct Slack messages between Mr. Seleznev and Mr. Temourians on the night of June 10, the night before Mr. Temourians' deposition. Also included in the production—which also contained 175 e-mails plus various videos and PowerPoint presentations—was a more complete version of a Slack communication discussed at the special 30(b)(6) deposition which exposed, as Defendants suspected, that Plaintiff had previously withheld highly relevant information damaging to its case. Specifically, during the special 30(b)(6) deposition, Mr. Touizer was questioned about whether the produced messages were "cut off," which they obviously were because every other conversation that had been produced had a picture of the sender at the top, but this particular one did not. (Ex. 3 at 340:13-344:17.) Mr. Touizer suggested he may have "cut off the picture and name" in order to capture the date of the message, but testified that he otherwise believed "that was the beginning of the message" and "to the best of [his] recollection, that that is where the conversation started." *Id*. It was not. As the production on the night of June 10 exposed, ████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████ *Compare* Exs. 16 and 17.

This information is highly relevant because it demonstrates ████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████ which directly undermines Plaintiff's only two remaining claims for misappropriation of trade secrets. Given that these messages were clearly reviewed by Mr. Touizer—as evidenced by the prior production of a portion of the conversation—there is no explanation for the failure to produce the conversation in its entirety other than a desire to withhold this extremely damaging information, which Plaintiff only disclosed after similar information had been elicited in Mr. Seleznev's deposition testimony and with the knowledge that Mr. Temourians would likely be questioned about the same document and confirm that it

was not complete.  There is also reason to believe that other highly relevant Slack messages still have not been produced.  For example, Plaintiff alleged in its Complaint that it conducted an investigation into Defendants' alleged misappropriation of trade secrets during the period from 2017 to May 2018, (Compl. at ¶¶ 33-36), yet Plaintiff does not appear to have produced any Slack messages from the period February 17, 2016 through June 19, 2018.

### E.    Plaintiff's Failure to Search for Responsive Videos

Mr. Touizer also did not recall asking anyone else to search for responsive videos and could not say whether he had done so himself, (30(b)(6) Tr. at 314:16-315:4), even though he "make[s] a lot of videos" and his "people make videos . . . as a communications tool."  *Id.* at 314:6-10.

## ARGUMENT

## I.    Sanctions Must Be Imposed on Plaintiff and SLG Pursuant to Rule 26(g) and 28 U.S.C. § 1927

SLG disregarded its obligations as counsel of record in violation of Federal Rule of Civil Procedure 26(g) by certifying Plaintiff's repeatedly false discovery responses.  Sanctions for such violations are mandatory and should be assessed against both Plaintiff and SLG.  Rule 26 requires that "[e]very disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name." Fed. R. Civ. P. 26(g).   The Rule "prescribes that the signature certifies that the filing conforms to the discovery rules, is made for a proper purpose, and does not impose undue burdens on the opposing party in light of the circumstances of the case." *Bernal v. All Am. Inv. Realty, Inc.*, 479 F. Supp. 2d 1291, 1333 (S.D. Fla. 2006). "Rule 26(g) broadly 'imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37,'" *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1350 (N.D. Ga. 2012) (citation omitted), and "imposes upon attorneys the duty to make a reasonable investigation to assure that their clients have provided all available responsive information and documents." *Bernal*, 479 F. Supp. 2d at 1333 (citation omitted); *see also EEOC v. M1 5100 Corp.*, No. 19-cv-81320, 2020 U.S. Dist. LEXIS 117243, at *6-8 (S.D. Fla. July 2, 2020) ("An attorney's signature on a discovery response is not a mere

formality; rather, it is a representation to the Court that the discovery is complete and correct at the time it is made.").[7]

Where an attorney has failed to satisfy the requirements of Rule 26(g) without substantial justification, "the court, on motion or on its own, ***must*** impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both." Fed. R. Civ. P. 26(g)(3) (emphasis added); *see also Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1372 (11th Cir. 1997) ("The decision whether to impose sanctions under Rule 26(g)(3) is not discretionary. Once the court makes the factual determination that a discovery filing was signed in violation of the rule, it must impose 'an appropriate sanction.'"). Under Rule 26(g), "the sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation." Fed. R. Civ. P. 26(g)(3). "[T]he party who is alleged to have failed to comply with Rule 26 bears the burden to show that its actions were substantially justified or harmless." *Prior v. State Farm Fire & Cas. Co.*, No. 8:11-cv-01448-T-27TBM, 2013 U.S. Dist. LEXIS 196029, at *2 (M.D. Fla. Feb. 7, 2013) (citation omitted).

SLG's sanctionable conduct includes its certification of Plaintiff's R&Os, which stated in response to each request that "Plaintiff has produced all responsive documents currently in its possession, custody and/or control." (Ex. 2.) At the time that certification was made, Plaintiff had (among other failures) not searched multiple e-mail accounts that contained responsive communications, not produced all responsive e-mails from the e-mail accounts Plaintiff did search, and failed to search its Slack account, which has been Plaintiff's "primary method" of business communication since 2014. As evidenced by numerous supplemental productions made months later, Plaintiff had not come anywhere close to producing all responsive documents in its possession, custody, and control, and the false certifications to the contrary constitute sanctionable conduct under Rule 26(g). *See, e.g.*, *Venator v. Interstate Res., Inc.*, No. CV415-

---

[7] *Accord Legault v. Zambarano*, 105 F.3d 24, 28 (1st Cir. 1997) ("[A] certifying lawyer must make 'a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand.'") (citation omitted); *Tradeshift, Inc. v. BuyerQuest, Inc.*, No. 20-cv-01294-RS (TSH), 2021 U.S. Dist. LEXIS 78658, at *8 (N.D. Cal. Apr. 23, 2021) ("Rule 26(g) places not only on the parties but also specifically on counsel an obligation to certify that a document production is complete."); *Johnson v. BAE Sys.*, 4 F. Supp. 3d 62, 68 (D.D.C. 2013) ("An attorney or party has a duty, per Rule 26(g), to perform a reasonable inquiry to determine whether a discovery response is complete and accurate.").

086, 2016 U.S. Dist. LEXIS 50964, at *26 (S.D. Ga. Apr. 15, 2016) (imposing monetary sanctions on counsel and plaintiff under Rule 26(g) where counsel certified disclosures were complete, but "Defendants' original document production was, . . . as their supplemental email production illustrates, not 'complete and correct.'"); *accord R & R Sails, Inc. v. Ins. Co. of State of Pa.*, 251 F.R.D. 520, 525 (S.D. Cal. 2008) (finding party liable for sanctions pursuant to Rule 26(g) where subsequent production of responsive information "demonstrate[d] that Defendant had made incorrect certifications to Plaintiff – as well as representations to the Court – that Defendant's production of discovery was complete.").

SLG is also subject to sanctions for certifying Plaintiff's Interrogatory Responses, which falsely stated, *inter alia*, that "the computer-based information already turned over in discovery represents all possible responsive computer-based information in Plaintiff's possession, custody, and control." (Ex. 9 at 12.) SLG's certification of Plaintiff's false statements in the Interrogatory Responses constitutes a particularly egregious violation of Rule 26(g) because it was made after SLG was put on repeated notice of Plaintiff's production deficiencies, and after being cautioned by the Court that the purported lack of responsive emails was "a little hard to believe." (Ex. 7 at 40:16-20; *see also, e.g.*, *Bernal*, 479 F. Supp. 2d at 1334 (finding that attorney failed to "satisfy his Rule 26(g) obligations when he signed his client's numerous false [discovery responses]" notwithstanding that they were "highly improbable" and that, in failing to "immediately challenge[]" the client the attorney "demonstrated a flagrant disregard of his obligations as counsel of record."). Indeed, despite the Court's skepticism and the implausibility of Plaintiff's claim that there were no additional responsive documents, rather than conduct any investigation to confirm its representations, SLG simply relied on Plaintiff's employees—who had no prior experience with U.S. litigation or discovery and are obviously self-interested in the outcome of this case—to conduct the searches for responsive ESI. *See* Ex. 9 at 14 (explaining that Plaintiff's discovery process "was effectuated through searches implemented primarily by Stephan Touizer and also by Ashot Temouriants"); Ex. 3 at 59:5-11 (confirming that nobody but Scanz employees was involved in the search for responsive documents), 253:15-254:8 (same with respect to investigation of missing e-mails with Rackspace).

Courts in this Circuit consistently recognize that SLG's conduct runs afoul of Rule 26(g)'s requirements:

> [A]n attorney cannot abandon his professional and ethical duties imposed by the applicable rules and case law and permit an interested party or person to 'self-collect' discovery without any attorney advice, supervision, or knowledge of the process utilized. ***There is simply no responsible way that an attorney can effectively make the representations required under Rule 26(g)(1) and yet have no involvement in, or close knowledge of, the party's search, collection and production of discovery*** . . . .

*M1 5100 Corp.*, 2020 U.S. Dist. LEXIS 117243, at *6-8 (emphasis added); *Bernal*, 479 F. Supp. 2d at 1334 (recommending Rule 26(g) sanctions because attorney did not "make a reasonable investigation to assure that his clients had provided all available responsive information"); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d at 1351-53 (N.D. Ga. 2012) (holding that "sanctions under Rule 26(g) are appropriate for [party's] failure to ensure that all collected hard drives were actually searched . . . and for its myriad inaccurate representations" and requiring party "to pay reasonable expenses, including attorneys' fees, caused by its violation"); *Venator*, 2016 U.S. Dist. LEXIS 50964, at *34 (finding Rule 26(g) violation where counsel "failed to oversee . . . electronic records searches and ensure that . . . *all* . . . e-mails in [client's] possession" were provided).   There is no justification for SLG's abdication of its obligations under the Federal Rules, which resulted in Defendants incurring substantial expense to obtain basic discovery months after it was due and months after SLG was on notice of the issue.[8]

---

[8] For similar reasons, relief is appropriate under 28 U.S.C. § 1927, which provides that "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  The statute allows the court to "assess attorney's fees against litigants, counsel, and law firms who willfully abuse the judicial process by conduct tantamount to bad faith."  *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1544 (11th Cir. 1993). To impose sanctions under § 1927, there is no requirement that an attorney must have acted "knowingly and malevolently"; rather, "the standard for imposing sanctions under § 1927 turns on the attorney's objective conduct as compared to how a reasonable attorney would have acted under the circumstances."  *Taverna Imps., Inc. v. A&M Wine & Spirits, Inc.*, No. 15-24198-CIV, 2018 U.S. Dist. LEXIS 125906, at *25 (S.D. Fla. July 27, 2018) (citing *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1282 (11th Cir. 2010)).  An award of fees and expenses incurred by Defendants in connection with their otherwise unnecessary efforts to unravel Plaintiff's and SLG's misrepresentations and obtain basic discovery is appropriate under § 1927.  *See, e.g.*, *Bernal*, 479 F. Supp. 2d at 1332 (recommending that attorney personally satisfy resulting costs from "series of [events] . . . that otherwise never would have been necessary" but for attorney's recklessness "when he relied solely on the word of his client before filing" a false affidavit).

## II.       Sanctions Should Be Imposed on Plaintiff Pursuant to Fed. R. Civ. P. 37(c)

Plaintiff violated Rule 37 by failing to timely supplement its document productions despite being put on repeated notice of their incompleteness by Defendants.  Appropriate sanctions under Rule 37(c) to remediate the prejudice suffered by Defendants should include ordering Plaintiff to reimburse Defendants' resulting fees and expenses.  Under Rule 37, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e)," it may be subject to sanctions "unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Rule 26(e) requires a party "who has responded to an interrogatory, request for production, or request for admission" to "supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect . . .; or (B) as ordered by the court."  If timely and proper disclosure is not made, "[t]he burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party."  *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009) (citation omitted).  "Rule 37 sanctions are imposed not only to prevent unfair prejudice to the litigants but also to insure the integrity of the discovery process."  *Aztec Steel Co. v. Fla. Steel Corp.*, 691 F.2d 480, 482 (11th Cir. 1982).

In addition to other relief, Rule 37(c)(1) authorizes the court, on motion and after giving an opportunity to be heard, to "(A) [] order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) [] inform the jury of the party's failure; and (C) [] impose other appropriate sanctions" including dismissal of the action.  Fed. R. Civ. P. 37(c)(1); Fed. R. Civ. P. 37(b)(2)(A)(v), (vi); *see also Shortz v. City of Tuskegee*, 352 F. App'x 355, 359 (11th Cir. 2009) (holding that dismissal under Rule 37 "may be appropriate when a plaintiff's recalcitrance is due to wilfulness, bad faith or fault" and is "not an abuse of discretion when a party demonstrates a flagrant disregard for the court and the discovery process") (internal quotations and citations omitted).

Despite being repeatedly notified by Defendants that Plaintiff's March 15 production was obviously incomplete, Plaintiff made repeated misrepresentations—including under oath—to both Defendants and the Court that it had produced all responsive documents.  It was not until the end of May, shortly before the close of fact discovery, that Plaintiff began producing hundreds of e-mails and Slack messages that it had repeatedly (and in the strongest possible terms) denied existed, and not until June—after Defendant disclosed its intent to move for

sanctions—that Plaintiff finally identified documents responsive to RFP No. 28.  As a result, Defendants needed to review hundreds of documents on the eve of multiple important depositions.

Plaintiff's misconduct here closely mirrors that in *U & I Corp. v. Advanced Med. Design, Inc.* (hereinafter "*AMD*"), in which the court imposed Rule 37 sanctions in light of the "unnecessary expense and delays" incurred by defendant "in attempting to obtain [plaintiff's] compliance with legitimate discovery requests."  251 F.R.D. 667, 675-77 (M.D. Fla. 2008).  In both *AMD* and this matter, the misconduct at issue includes (1) plaintiff's inaccurate assertion "that it had fully responded" to document requests, which was followed by additional "sporadic and incomplete" document productions; (2) plaintiff's failure to inform defendant that certain potentially responsive emails were not available "when it initially responded to [defendant's] document request"; and (3) plaintiff's "perplexing . . . failure to produce any responsive internal documents between [plaintiff's] employees" coupled with an "assertion that it ha[d] produced all requested information."  (*Id.* at 675.)  In imposing sanctions under Rule 37—including an award of fees and costs and inspection of certain document sources—the court observed that "[i]t is not the court's role, nor that of opposing counsel, to drag a party kicking and screaming through the discovery process."  (*Id.* at 676.)  The court further stated that "a lack of understanding of the American legal system does not excuse [plaintiff's] tardy and incomplete responses" and that, as the party that filed the lawsuit, "[plaintiff] and its counsel had the responsibility [at the outset of the litigation] to take affirmative steps to ensure that all sources of discoverable information were identified, searched, and reviewed so that complete and timely responses to discovery requests could be provided."  (*Id.* at 675-76.)

Here, as in *AMD*, Plaintiff and SLG have disregarded their responsibilities under the Federal Rules and the Court should impose sanctions to remediate the resulting prejudice to Defendants and deter future misconduct by Plaintiff.  *See, e.g.*, *AMD*, 251 F.R.D. at 676 (monetary sanctions "are both appropriate and necessary to compensate [defendant] for its expense and to deter [plaintiff] from future discovery violations"); *Jaffe v. Bank of Am., N.A.*, No. 07-21093, 2008 U.S. Dist. LEXIS 128557, at *8 (S.D. Fla. Apr. 29, 2008) (imposing sanctions under Rule 37(c)(1) and observing that "[w]hen a party answers a request by stating that the requested documents do not exist, the other party is, at some point, entitled to rely on that statement"); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d at 1359

(awarding monetary sanctions under Rule 37(c)(1) where party "made myriad misrepresentations to the Court and Plaintiffs that its document production was complete, and it waited almost two weeks to inform the Court of the problems with its document production"); *Dragon Jade Int'l, Ltd. v. Ultroid, LLC*, No. 8:17-cv-2422-T-27CPT, 2019 U.S. Dist. LEXIS 196144, at *11 (M.D. Fla. Nov. 12, 2019) (finding Rule 37(c)(1) sanctions appropriate in light of "eleventh hour" disclosure of responsive document months after initial responses to discovery requests and less than a week before the close of discovery).

Though not Defendants' burden, Plaintiff's failure to comply with its discovery obligations was neither harmless nor justified. Defendants have been forced to divert an enormous amount of time and resources—which could otherwise have been spent on substantive matters related to this litigation—to exposing Plaintiff's lies, and have incurred substantial "unnecessary expense" to obtain discovery to which Defendants were clearly entitled. *AMD*, 251 F.R.D. at 675. But for this money, time and effort, Plaintiff and its counsel would have stood by their "myriad misrepresentations" to Defendants and the Court and would never have produced documents that are not only relevant but critical to this case. *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d at 1359. Defendants should "at the very least" be awarded their reasonable fees and expenses incurred as a result of Plaintiff's repeated misrepresentations and failure to timely supplement and correct their inaccurate disclosures. *Travelers Ins. Co. v. Commercial Cool-Temp Corp.*, No. 11-61748-DIMITROULEAS/S, 2012 U.S. Dist. LEXIS 201783, at *30 (S.D. Fla. Sep. 5, 2012) ("Implicit in Fed. R. Civ. P. 37 is the recognition that in cases of discovery abuse, the non-offending party should at the very least be compensated by the non-complying party and/or its counsel, if circumstances warrant, for the added expenses caused by the violation.").

## **CONCLUSION**

For the foregoing reasons, the Court should grant the Motion and award Defendants their requested relief, along with any such further relief that the Court deems just and proper, particularly in light of Plaintiff's counsel's misrepresentations to the Court.

## Local Rule 7.1(a)(3) Certification

Pursuant to Local Rule 7.1(a)(3), undersigned counsel certifies that counsel for the Defendants have conferred with Plaintiff's counsel in a good faith effort to resolve the issues raised by this motion without Court involvement, but the parties have been unable to reach a resolution.

Dated:  June 17, 2021

Respectfully Submitted,

/s/ *Justin B. Elegant*
Justin B. Elegant
Florida Bar No. 0134597
Sabrina T. Zarco
Florida Bar No. 1025800
BERGER SINGERMAN LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Phone: (305) 755-9500
jelegant@bergersingerman.com
szarco@bergersingerman.com

ALSTON & BIRD LLP
Brett D. Jaffe (admitted *pro hac vice*)
Steven R. Campbell (admitted *pro hac vice*)
90 Park Avenue
New York, New York 10016-1387
Phone: 212-210-9400
brett.jaffe@alston.com
steven.campbell@alston.com

David S. Frist (admitted *pro hac vice*)
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
Phone: 404-881-7000
david.frist@alston.com

*Attorneys for Defendants Jewmon Enterprises,*
*LLC, Timothy Sykes, Millionaire Publishing, LLC,*
*and Millionaire Media, LLC*

SQUIRE PATTON BOGGS (US) LLP
Raúl B. Mañón
Florida Bar No. 18847

200 South Biscayne Boulevard, Suite 4700
Miami, FL 33131
Phone: +1 305-577-7000
raul.manon@squirepb.com

Gabriel Colwell (admitted *pro hac vice*)
555 South Flower Street, 31st Floor
Los Angeles, CA 90071
Phone: +1 213-689-5126
gabriel.colwell@squirepb.com

Joseph A. Meckes (admitted *pro hac vice*)
275 Battery Street, Suite 2600
San Francisco, CA 94111
Phone: +1 415-954-0201
joseph.meckes@squirepb.com

*Attorneys for Defendants StocksToTrade.com, Inc.*
*and Zachary Westphal*